UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

COMPLEX SYSTEMS, INC.,

                           Plaintiff,

            -v-

ABN AMRO BANK N.V.,

                          Defendant.

------------------------------------------------------------------X

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED: JUN 2 1 2013             │
└─────────────────────────────────────┘
```

08 Civ. 7497 (KBF)

CORRECTED OPINION
& ORDER

KATHERINE B. FORREST, District Judge:

      This motion raises the question of whether – in the chaos of a fast-paced transaction – a mission-critical license was successfully assigned to the entity that needed it most.   For the reasons set forth below, the Court finds that it was not.

      In 2007, a Dutch banking institution, defendant ABN AMRO Bank N.V. ("ABN") sold a significant group of assets to Bank of America Corporation ("BAC"). Part of that transaction involved the sale of an entity, ABN AMRO Information Technology Services Company, Inc. ("IT"), which was the licensee of a mission critical financial services software application called "BankTrade."  Among the agreements ABN and BAC negotiated was a rather routine transition services agreement ("TSA") which allowed for the parties to insure that services which needed to be transferred over time could be, without significant business disruption. What was not done, however, was a clear transfer of important contract rights pre-closing – including as to the BankTrade application.  The instant lawsuit has been

1

litigated now for more than four years based almost entirely on a theory of assignment. That theory is unhelpful to ABN as briefed on this motion and described throughout the record. However, as determined below, other theories remain unresolved – the parties have not moved as to them and the Court does not here address them. With respect to the assignment theory here briefed, the story proceeds as follows:

ABN continued to need BankTrade post-closing, and it was too late to take advantage of what pre-closing had been a clear ability to assign without cost or penalty. Post-closing the world changed in that regard – what was not done could not be retroactively accomplished without the involvement and agreement of BankTrade's owner,[1] plaintiff Complex Systems, Inc. ("CSI"). And, as it happened, CSI exercised its right to simply say "no" – or, more correctly, "no, without significant additional payment." Such payment was not forthcoming. Instead, ABN, which acknowledges that it has continued to use BankTrade without interruption since the 2008 sale transaction, tried to reinterpret pre-closing events to include an assignment of the BankTrade license. Such an assignment would indeed have been easy to effect pre-closing. But it was not effected – and the law does not credit revisionist history with the weight of truth.

Instead, ABN must live with the events that, in fact, occurred – not what could have occurred, or should have occurred. That such failure to assign was perhaps an oversight, or that such a failure to assign has resulted in significant

---

[1] The ownership of BankTrade, apart from any purported assignment of a license to use it, is also in dispute in this action. The parties did not brief that issue on this motion, however. Accordingly, for the sake of simplicity, the Court refers to CSI as though it is the undisputed "owner" of BankTrade for purposes of this motion.

economic exposure, is not the issue. The issue is whether there was a pre-closing assignment. There was not. That much is clear.

In August 2008, CSI sued ABN for its unlicensed use of BankTrade. CSI now moves for partial summary judgment that ABN does not hold a license to the BankTrade software. ABN's opposes the motion and cross-moves for summary judgment, arguing that an assignment was in fact conveyed between IT and ABN pre-closing. On the evidence in the record, no rational juror could so find. Accordingly, CSI's motion for partial summary judgment is granted and ABN's motion for summary judgment is denied. Left unresolved, however, are ABN's remaining defenses – most of which were not addressed in either party's motion.

## BACKGROUND

The facts set forth below are undisputed except as indicated.

### The Parties and Their Transactions

Plaintiff CSI is a provider of software and related services used in the banking industry. CSI owns the BankTrade software product that is used by well known banking institutions to assist with automating aspects of various financial products including, for instance, letters of credit.

In October 1997, CSI and IT entered into a license agreement ("License Agreement") relating to BankTrade. At the time, IT had its principal office in Chicago, Illinois, and was owned by LaSalle Bank Corporation ("LaSalle"). LaSalle was, in turn, owned by ABN AMRO North America Holding Company ("ABN AMRO North America"), which was owned by ABN.

3

The License Agreement states that while the agreement is non-transferable, it may be assigned to IT's subsidiaries, affiliates and any direct or indirect parent or any subsidiary or affiliate of such parent. (See Decl. of Jeffrey I. Kaplan in Support of Pl. [CSI]'s Combined Mem. in Opp'n to ABN's Mem. for Summary Judgment and in Supp. of CSI's Mot. for Summary Judgment, dated Aug. 3, 2012 ("Kaplan Decl.") Ex. A, §§ 1, 20.) The License Agreement provides for the following scope of use:

> The License granted under this Agreement authorizes the Licensee to use a required number of copies of the System in machine readable form to service all North American (i.e. Canada, United States, Mexico) entities as listed below, as permitted by the License Agreement, by the Licensor, in any location. The copies shall be used solely for processing Licensee internal banking work of any parent, subsidiary or affiliated entity, direct or indirect, of Licensee, and not for any other purpose of entity. A direct or indirect parent, subsidiary or affiliate of Licens[ee] shall be defined as any entity which is at least 80% owned by ABN-AMRO Bank N.V. and / or ABN-AMRO North America . . . . No right to print or copy, in whole or in part, the System is granted hereby except as hereinafter expressly provided.

(Id. § 2.) CSI and IT entered into two addenda to the License Agreement – the first in June 2001, and the second in July 2002. (Kaplan Decl. Ex. B.) The 2001 addendum extended the use of the system to allow for processing banking work for other banks and for use of the system outside of North America. (Id.) Both addenda state that, except as specified, the License Agreement shall not be amended or modified and shall continue in full force and effect. (Id.)

A decade later, in April 2007, ABN and BAC entered into a Purchase and Sale Agreement ("PSA") pursuant to which ABN would sell LaSalle and certain of its United States assets to BAC (the "LaSalle Transaction"). The LaSalle

Transaction was negotiated quickly – in a matter of days – in an attempt by ABN to

thwart being targeted by a consortium of banks led by The Royal Bank of Scotland

("RBS"). ABN believed that the RBS consortium was interested in its United States

retail banking operations. Newspapers reported the quickly-negotiated sale

transaction as an attempted "poison pill" measure to avoid a deal with RBS.

ABN and BAC negotiated a purchase price of $21 billion for ABN North

America, LaSalle, and IT. The PSA was executed on April 22, 2007. The PSA does

not include language indicating that ABN would execute any assignments of any

licenses or cause any of its subsidiaries to do so.[2] The PSA does include provisions

requiring that prior to closing, ABN would transfer certain assets to subsidiaries

being acquired by BAC, and other provisions in which subsidiaries were

transferring assets up to ABN (so that they would not be acquired). (Kaplan Decl.

Ex. D §§ 6.12, 6.13.) These sections do not mention software licenses or BankTrade.

The transaction closed on October 1, 2007. During the interim period of

almost six months, the parties engaged in significant discussions regarding

transitioning business and operations. They accordingly entered into a Transition

Services Agreement (the "TSA"), which provided that ABN and BAC would provide

certain services to each other. Annex 1(d) to the TSA is a "[l]ist, complete in all

material respects, prepared by ABN AMRO, of all third party vendors used in the

provision of services by either party as Service Provider." (Kaplan Decl. Ex. E §

---

[2] There are a number of provisions in the PSA in which ABN, as seller, commits to cause its affiliates to take certain actions. (See, e.g., Kaplan Decl. Ex. D §§ 2.1, 5.3(a), 6.9(b).)

1(d)(vii); see also id. Annex 1(d).)  The TSA does not include language in which ABN assigned or agreed to cause its subsidiaries to assign any licenses.[3]

In this litigation, ABN's license defense rests upon its assertion that Section 1(a)(vii) of the TSA either acts as an assignment of BankTrade from IT to ABN pre-closing, or reflects that such an assignment has already occurred.  (See, e.g., ABN Mem. in Supp. at 12-31.)  There is no explicit language to this effect and thus the argument is based on inference drawn from the provisions.

## Evidence Concerning the Purported Assignment from IT to ABN

The record on this motion contains extensive documentary evidence demonstrating that the BankTrade license was transferred to BAC in the LaSalle Transaction, and that – despite whether any assignment actually occurred – the parties contemplated that BAC would re-assign to ABN several licenses acquired in the LaSalle Transaction.  That evidence is summarized below:

First:  Annex 1(a)(vii) of the TSA includes:

> a list, complete in all material respects, prepared by [ABN], of applications used in the provision of Services by either party as Service Provider.  Annex 1(a)(vii) sets forth in the column labeled "**Book Owner**" the owner of each application.  The parties agree that the Book Owner set forth in Annex 1(a)(vii) is the owner of the application listed thereon.

(Kaplan Decl. Ex. E § 1(a)(vii) (emphasis in original) and Annex 1(a)(vii).)  There is no "Book Owner" listed for BankTrade; the "Application Owner" is listed as ABN.

---

[3] In certain provisions in the TSA, ABN and BAC each commit to cause subsidiaries to take certain actions.  (See, e.g., Kaplan Decl. Ex. E §§ 1(d)(i); 2(c); 25(c); 29.)

(Id. at Annex 1(a)(vii) p. 5.)[4]  However, in August 27, 2007, ABN wrote to CSI and indicated that as part of BAC's upcoming acquisition of LaSalle, the BankTrade license would remain with IT.  (Kaplan Decl. Ex. K.)  As with much of the evidence that the BankTrade license transferred to BAC along with IT, ABN states that the "letter reflects the misunderstanding that software licenses nominally held by [IT] would automatically transfer to BAC in the LaSalle Transaction." (Def. [ABN]'s Response to [CSI]'s Statement of Undisputed Material Facts ("ABN's Resp. to CSI SOF") ¶ 34.)

Second:  In a progress chart created in 2008 (and therefore post-closing), ABN lists the BankTrade application as a "critical contract." (Kaplan Decl. Ex. N.)  That same chart contains columns entitled "Application Owner" and "Contract Owner". It is undisputed that ABN appears as the "Application Owner" with respect to BankTrade.  (Id. at row 3 column E.)  "Contract Owner" is listed as "TBD"; but the remaining columns show that BAC was to use BankTrade until its "exit" from the application on October 17, 2008, at which point – after the LaSalle Transaction closed – BAC and ABN would negotiate with CSI for an assignment back to ABN. (Id. at row 3 columns D, F, M.)  That same exhibit also lists ABN as the Application Owner of signature verification software licensed by a company called Entrust to LaSalle.  (Id. at row 11, column E.)  On February 25, 2008, BAC, Entrust and ABN executed an assignment agreement.  (Kaplan Decl. Ex. O.)  That agreement states,

---

[4] Notably, Annex 1(a)(vii) in fact contains no column for "Book Owner."  It's columns are: "App ID"; "Application Name"; "Application Description"; "Application Owner"; "Application Clients"; and "Footnotes."  (See Kaplan Decl. Ex. E at Annex 1(a)(vii).)  Nor does another chart mentioning BankTrade, discussed in detail infra, which instead contains columns for "Contract Owner" and "Application Owner."  (See Kaplan Decl. Ex. N.)

"as a result of the Assignment, Bank of America/LaSalle will no longer be party to the Agreement." (Id.) Similarly, the same ABN chart lists ABN as the "Application Owner" for Internet Security Systems, Intellitactics and Qualys – but BAC is listed as the "Contract Owner". For these applications, which like BankTrade have ABN listed as "Application Owner," the owner of the actual contract or license was BAC. (ABN states that "this document was generated during a period of confusion." (See ABN's Resp. to CSI SOF ¶ 22.))

Third: When ABN's 30(b)(6) witness in this litigation was asked about why, if the TSA conveyed an assignment of BankTrade to ABN, there were two different "owners" listed on the chart, he responded that he did not know (Kaplan Decl. Ex. AA at 147 (Q: So then why are there two different owners listed here, the contract owner and the TSA application owner, if both are the same? A: I don't know.").) Moreover, another ABN witness testified at his deposition about the TSA as follows:

> Q; Do you know if – when the column [Titles Application Owner in Annex 1(a)(vii)] was compiled if legal ownership of the contract was accounted for . . . .
>
> A: Legal ownership was not part of that conversation.

(Kaplan Decl. Ex. W at 31-32), and,

> Q: The TSA and the appendices between all of that mentions a lot of different contracts, software contracts, Annex 1A-7 that we talked about lists dozens if not hundreds, right?
>
> A: Well, mentions more the bank name, not necessarily the contract. So, BankTrade would be – refer to GTP, you know, MaxTrade, these were names of bank applications as they were known internal to the organization, not necessarily the associated contracts . . . .

8

(Kaplan Decl. Ex. W at 167.)

Fourth:  An internal ABN email dated June 3, 2008, states that "[w]e are at the mercy of BAC to assign these contracts back to [ABN] . . . .  I have flagged these agreements to BAC to understand their usage and ability to assign these contracts back to [ABN]."  (Kaplan Decl. Ex. R at 1.)  ABN states that this document was "generated during a period of confusion."  (ABN's Resp. to CSI SOF ¶ 27.)  The "Application Owner" of the contracts to which this email refers is ABN.  (See Kaplan Decl. Ex. U at 23 ("Lexsi"); at 31 ("Qualsys"); at 34 ("Sourcefire").)  In other words, the email discussed applications, like BankTrade, for which ABN was the application owner and either BAC was holding the application's license until it's "exit" and a future assignment back to ABN, or BAC already was the contract holder.  There are a number of additional instances in which ABN internal documents list ABN as the "Application Owner", but as to which assignments back to ABN are noted as needing to occur or in process.  (See, e.g., Kaplan Decl. Ex. T (MTI's "[r]equested [a]ssignment from BAC to be completed by end of August [2008]"; and as to Sourcefire, Lexsi, Qualys and Intellitactics, BAC had "requested" or "required" assignment).)

Fifth:  On February 29, 2008, Tom Trujillo of BAC wrote to CSI that the BankTrade license "remains with the contracting LaSalle entity [e.g., IT] (which entity is among those bought by Bank of America)."  (Kaplan Decl. Ex. F at 1.)  ABN states "that letter reflects the misunderstanding that software licenses nominally held by [IT] would automatically transfer to BAC in the LaSalle Transaction." (ABN's Resp. to CSI SOF ¶ 35.)

Sixth: An ABN March 2008 document entitled "AANA Procurement Contract Strategy Project" has a flowchart which sets forth multiple possible strategies for assignment/retention of ABN's various application licenses during the sale to BAC. One – although not the only – appropriate strategy for applications for which ABN was the application owner, was for BAC – which would be the owner of the license after the transaction – to re-assign the license back to ABN. (See Kaplan Decl. Ex. M at 2, 3.)

Seventh: A March 2008 ABN internal email states, "As you all know, BAC still owns the BankTrade software. BAC has stated they will not be off version 6.2 until October [2008] nor will we look for BAC to assign this contract to [ABN] until such time later this year. [ABN] employees or contractors should not be manipulating the software/source code. It should be managed by BAC or its contractors only at this point in time." (Kaplan Decl. Ex. L.) ABN states that this email reflects the author's "incorrect and uninformed assessment of how software applications were allocated in the LaSalle transaction." (ABN's Resp. to CSI SOF ¶ 32.)

Eighth: On March 3, 2008, Sheldon Goldfarb, an attorney with RBS, wrote to CSI that "[ABN] is not a party to the License Agreement." (Kaplan Decl. Ex. H.) ABN states that this letter "reflects the misunderstanding that software licenses nominally held by [IT] would automatically transfer to BAC in the LaSalle Transaction." (ABN's Resp. to CSI SOF ¶ 38.) On April 25, 2008, Michael Lofgren of RBS and Jack Eisner of CSI had a telephone conversation in which ABN offered to pay CSI a "small administrative fee" for the right to have BAC assign the

10

BankTrade license to ABN. (Kaplan Decl. Ex. P.) ABN states that "Mr. Lofgren's opinion suggested by the Exhibit P reflects the misunderstanding" as set forth numerous times above. (ABN's Resp. to CSI SOF ¶ 39.)

Ninth: On April 11, 2008, Holly Lussier at RBS (which had acquired ABN), wrote to Warren Browne of CSI that "I would like to thank you and the other members for meeting with us yesterday. Pursuant to that discussion, we confirmed with you that BAC as successor in interest to [IT] is currently the licensee under the License Agreement, all addenda thereto, and the subsequent [agreement. We] would like to assign the Agreements back to ABN." (Kaplan Decl. Ex. G.) ABN states that this letter "reflects the misunderstanding that software licenses nominally held by [IT] would automatically transfer to BAC in the LaSalle Transaction." (ABN's Resp. to CSI SOF ¶ 37.)

Tenth: In June 2008, ABN wrote that "BAC will provide the Right to Use [to ABN] after they are off BankTrade in October [2008]. CSI is expected to require a significant amount in fees for this assignment. The lawyers from BAC and RBS both agree that we [ABN] are not currently in breach of the contract held by BAC and that BAC can't assign the contract [to ABN] without consent from CSI." (Kaplan Decl. Ex. X.) ABN states that this reflects the same "misunderstanding" set forth above. (ABN's Resp. to CSI SOF ¶ 40.) The same document states that "ABN is working with BAC to put forward our position, which states that within the TSA there is an implicit assignment of license to ABN. Once BAC agrees with ABN's position, ABN can approach Complex Systems. The issue with Complex Systems will not be resolved by 7/1/08 but . . . we need to go forward regardless."

11

(Kaplan Decl. Ex. X.)  Several weeks later, on July 23, 2008, an ABN document states that "BAC and RBS Legal Departments have come to agreement on how they want to proceed with Complex." (Kaplan Decl. Ex. BB at 2.)

## Procedural History

CSI filed this lawsuit on August 25, 2008.  (ECF No. 1.)  An amended complaint was filed in December of 2008.  (ECF No. 16.)  In June 2012, ABN moved for summary judgment.  (ECF No. 159.)  On August 23, 2012, plaintiff opposed defendant's motion and cross-moved.  The judge previously presiding over this matter retired in December 2012 and it was transferred to this Court that month. (ECF Nos. 178, 179, 180.)

LEGAL STANDARDS

## Summary Judgment Standard

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a

12

genuine issue of material fact for trial.  Price v. Cushman & Wakefield, Inc., 808 F.

Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d

Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true

nature of the facts to overcome a motion for summary judgment," as "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of

material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159,

166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In

seeking to show that there is a genuine issue of material fact for trial, the non-

moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there

is a genuine issue for trial.").

  In addition, self-serving affidavits, sitting alone, are insufficient to create a

triable issue of fact and defeat a motion for summary judgment.  See BellSouth

Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn., 77 F.3d 603, 615 (2d Cir. 1996).

Only disputes relating to material facts--i.e., "facts that might affect the outcome of

the suit under the governing law"--will properly preclude the entry of summary

judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

(stating that the nonmoving party "must do more than simply show that there is

some metaphysical doubt as to the material facts").

**Law Relating to Contracts and Assignment**

New York law[5] provides that courts should enforce the plain meaning of contracts when that meaning is clear and unambiguous. Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002). Courts should look at a contract as a whole, giving effect to provisions in their totality, in order to construe its plain meaning. See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005).

If a contract is ambiguous, the Court may look to extrinsic evidence to determine its meaning, including evidence of the parties' intent. N.Y. Marine & Gen. Ins. Co. v. Lafarge North America, Inc., 599 F.3d 102, 114 (2d Cir. 2010). While summary judgment is usually denied when the Court has determined that contractual language is ambiguous, "the Court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is so one-sided that no reasonable person could decide to the contrary . . . [or] where there is no extrinsic evidence that would support a resolution of the ambiguities in favor of the nonmoving party's case." Id. at 115 (internal quotation marks and alterations omitted) (citing Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) (Sotomayor, J.)). Furthermore, the "conduct of parties provides [an] important source for deriving their intent as to the meaning of the . . . contracts at issue," and "there is no surer way to find out [the intent of the parties to a contract]

---

[5] The License Agreement contains a New York choice of law provision. (See Kaplan Decl. Ex. A § 18.)

. . . than to see what they have done." See id. at 119; IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370, 374 (2d Cir. 1994).

A parent company has the right to dispose of the property of a subsidiary as long as that disposal does not impair the rights of creditors. See In re Pearl-Wick Corp., 26 B.R. 604, 607 (S.D.N.Y. 1982); see also Capitol Wine Spirit Corp. v. Pokrass, 277 A.D. 184, 188 (1st Dep't 1950).

New York law does not require a formal writing or any particular formalities in order to convey the assignment of a license from one party to another. See Aini v. Sun Taiyang Co., 964 F. Supp. 762, 778 (S.D.N.Y. 1997) (courts should look to substance and not form; the ultimate question is the intent of the parties). Use of the term "assignment" is not required. See In re Estate of Boissevain, 40 Misc. 2d 237, 244 (N.Y. Surrogate's Court, New York County 1963). Any acts or words that evidence an assignor's intent to divest itself of its property are sufficient to effectuate an assignment. See Diagnostic Medical Assoc., M.D., P.C. v. New York City Dist. Council of Carpenters Welfare Fund, 04 Civ. 7662, 2006 WL 728486, at * 7 (S.D.N.Y. Mar. 21, 2006); Rhythm & Hues, Inc. v. The Terminal Marketing Co., 01 Civ. 4697, 2004 WL 941908, at *12 (S.D.N.Y. May 4, 2004); Adams v. Garzillo, 155 Misc. 358, 359 (N.Y. Municipal Ct., Borough of Manhattan 1935).

A subsidiary need not be a signatory to a document by which a parent disposes of its property. See Daley v. Related Cos., 198 A.D.2d 118, 119 (1st Dep't 1993); In re Pearl-Wick, 26 B.R. at 607; Retail Advisors Inc. v. IT Holding SPA, No. 60311/2008, 2009 WL 2198266 (N.Y. Sup. Ct. July 13, 2009).

DISCUSSION

ABN's primary argument on this motion is that it is a valid assignee of IT's license to the BankTrade software. As a valid assignee, ABN argues, it cannot be liable for copyright infringement, and plaintiff's claims must fail. The Court rejects this argument.

As an initial matter, neither party disputes that to be valid, any assignment of the BankTrade license must have occurred prior to closing the LaSalle Transaction. The License Agreement specifically states that it is non-transferable; but also states that assignments may be made to the "above mentioned entities" – which include IT's direct or indirect parent, subsidiary or affiliate. (Kaplan Decl. Ex A §§ 1, 20). Those entities are defined as being owned eighty-percent by ABN and/or ABN North America. (Id.) Prior to consummation of the LaSalle Transaction, it is undisputed that IT was owned by ABN. However, it is also undisputed that once closing occurred, IT was transferred to BAC and was no longer an affiliate of ABN. As a result, unless the assignment of the BankTrade license occurred prior to the closing on October 1, 2007, ABN was unable unilaterally to effect such an assignment.

It is also undisputed that there was no formal assignment of the BankTrade license from IT to ABN prior to October 1, 2007, when the LaSalle Transaction closed. If there were such an assignment, this lawsuit either would never have been brought or would have been disposed of long ago. Instead, ABN's position is based upon a counter-factual reading of the TSA. But notably, ABN never states that the TSA in fact "assigns" the BankTrade license to ABN. Instead, it argues that "[t]he

16

TSA expressly designates ABN as the owner of the BankTrade software." (See ABN Mem. in Supp. at 8.) Or, as put elsewhere, that the TSA "allocates" BankTrade to ABN. (See ABN Mem. in Opp'n to Pl.'s Cross-Mot. and in Further Supp. at 7.)

Section 1(a)(vii) of the TSA states, in relevant part:

> Annex 1(a)(vii) sets forth in the column labeled "Book Owner" the owner of each application. The parties agree that the Book Owner set forth in Annex 1(a)(vii) is the owner of the applications listed thereon.

(Id. at 8.) Thus, to complete the circle, one must turn to Annex 1(a)(vii). Here, ABN is identified as the "Application Owner" of many applications – including BankTrade. This chart contains columns neither for "Contract Owner", nor for "Book Owner." But ABN's internal progress chart shows that BAC would "exit" the BankTrade application on October 17, 2008 – after the LaSalle Transaction closed – at which point BAC and ABN would negotiate as assignment of BankTrade back to ABN. (See Kaplan Decl. Ex. N at row 3 columns D, F, M.) While it is certainly true that New York law does not require magic words to effect an assignment, words or actions must reflect an intent to assign. See, e.g., Diagnostic Medical, 2006 WL 728486, at * 7; Rhythm & Hues, 2004 WL 941908, at *12; Adams, 155 Misc. at 359. ABN argues that Annex 1(a)(vii) of the TSA is all that is needed: ABN was identified as the "Application Owner", thereby manifesting an intent to own the application, and therefore that is sufficient to assign. The problem of course, is that the delay in time between the intent and when the assignment was to occur renders any assignment (without CSI's permission) impossible. That ABN wanted BankTrade to be assigned to it later – after the closing – does not effect the required

17

pre-closing assignment. ABN's reading of the TSA to reflect a pre-closing assignment stretches the language of this provision beyond where it may reasonably be stretched. There are several clear reasons why this is so.

First, ABN never argues that an assignment occurred anywhere other than in this section of the TSA – for instance, prior to its entry into the TSA. Thus, ABN is limited to the language of section 1(a)(vii) and Annex 1(a)(vii) for the assignment. (For example, ABN could have, but did not, have a one line assignment from IT to ABN.) To ground its argument in this section of the TSA, ABN must ignore the facts that (1) the TSA itself shows no assignment; and (2) ABN's own progress chart indicates that an assignment would not happen until after the LaSalle Transaction closed. There is simply no sensible reading of these documents indicating that an assignment had occurred – in other words, no reasonable juror could conclude that one had.

Moreover, this reading renders the provision itself internally consistent. As set forth above, there are a number of software applications other than BankTrade listed on Annex 1(a)(vii) – and as to which BAC would own at least through the transaction's closing or for which BAC is listed as the Contract Owner and ABN as the Application Owner. Plus, post-closing conduct and documents are consistent with ABN and BAC understanding that the contracts/licenses for these applications resided with BAC, but that eventually there would be a need to transfer formal contractual ownership to ABN. For instance, an internal ABN email dated in early 2008, states "[w]e are at the mercy of BAC to assign these [various software] contracts back to [ABN] . . . . I have flagged these agreements to BAC to

understand their usage and ability to assign these contracts back to [ABN]."
(Kaplan Decl. Ex. R at 1.)  (ABN states that this document was "generated during a
period of confusion."  (ABN's Resp. to CSI SOF", ¶ 27.))  But, the "Application
Owner" of the contracts to which this email refers is ABN.  (Kaplan Decl. Ex. U at
23, 31, 34.)  And there are a number of additional instances in which ABN internal
documents list ABN as the "Application Owner", but as to which assignments back
to ABN are noted as needing to occur or in process.  (See, e.g., Kaplan Decl. Ex. T.)

　　　　ABN also urges in support of its position that the testimony of those at ABN
and BAC who negotiated the LaSalle Transaction indicates an intention that ABN
would retain BankTrade.  (See, e.g., ABN Mem. in Supp. at 9-10.)  That may well be
true – but such intent on the part of members of the negotiating team could not
itself assign the license.  There is no statement from anyone that they intended that
IT would in fact assign the License Agreement to ABN – and that such assignment
was in fact reflected in Annex 1(a)(vii) of the TSA.  Rather, ABN argues that several
of these individuals intended that Section 1(a)(vii) and Annex 1(a)(vii) would "serve
as the mechanism for determining software ownership."  (See ABN Mem. in Supp.
at 9).  However, the language of this provision is logically read as indicating that
there was an intention that BAC would be the owner, and that ABN was the user of
the application – leaving for another day how transfers to sort out contract
ownership would occur.  ABN argues that no witness testified that it was the intent
that BAC acquire the BankTrade license.  (See ABN Mem. in Supp. at 10.)  But of
course some affirmative intent that BAC would acquire the BankTrade license is
unnecessary – the license was between IT and CSI; in the absence of an assignment

19

no affirmative intent was necessary, the license would transfer automatically with IT to BAC. And thus, whether BAC wanted the license or not, it became the owner of the contracting entity in whom the license resided.

ABN argues that post-closing conduct supports that an assignment occurred. (See ABN Mem. in Supp. at 10.) According to ABN, since it was the party whose commercial and international banking businesses most needed the BankTrade software, it would not have made any sense to have left the license with IT. (Id.) This argument does not, however, eliminate the possibility of oversight in connection with a very large transaction – negotiated in days to fend off a hostile takeover (ultimately unsuccessful). Whether there was in fact an assignment of the BankTrade license relates to whether pre-closing IT and/or ABN as IT's owner, intended to and did assign the contract. If such an assignment did not occur, it matters not that such an assignment would have been prudent.

ABN's argument also runs into the clear evidence that no assignment occurred pre-closing. As exhaustively set forth above, there are numerous documents between ABN and BAC, and BAC and CSI, and ABN and CSI, which reflect the understanding that no pre-closing assignment had occurred, but that there was a strong desire for one to occur post-closing. (See, e.g., Kaplan Decl. Exs. F, N, R.)

There is also clear evidence in the record that the argument that the TSA reflects the assignment is a post-hoc argument – developed after CSI would not allow the assignment for a nominal sum. Specifically, an ABN chart states that "ABN is working with BAC to put forward our position, which states that within the

TSA there is an implicit assignment of license to ABN. Once BAC agrees with ABN's position, ABN can approach Complex Systems. The issue with Complex Systems will not be resolved by 7/1/08 but . . . we need to go forward regardless." (Kaplan Decl. Ex. X.) And a later ABN document states that "BAC and RBS have come to agreement on how they want to proceed with Complex." (Kaplan Decl. Ex. BB at 2.)

The language in the first of these documents demonstrates that agreement between BAC and ABN regarding whether now to read the TSA as implicitly conveying an assignment had not yet been reached. Instead, such agreement was reached by July 23, 2008.

That the TSA could have reflected an assignment is not the issue – and it is a proposition that this Court accepts. However, whether something "could" have been done and whether it "was in fact" done are altogether different. If it "had" been done, BAC and ABN/RBS would not have expressed repeatedly that they understood that BAC had not assigned the license pre-closing but wanted to do it post-closing.[6] The alleged "misunderstanding" stands alone as a post hoc, lawyer-created position following disappointment in negotiations with CSI.

There is no disputed issue of fact as to whether, at the time the TSA was executed – just days before closing the LaSalle Transaction – an assignment of the

---

[6] According to ABN, since both it and BAC agree on this interpretation of the TSA, CSI has no right to argue to the contrary. (See ABN Mem. in Supp. at 17-18.) This argument only works to the extent that this interpretation is not a post-hoc agreed interpretation – but that it is in fact reflective of what the parties intended at the time. The evidence is to the contrary. Therefore, that ABN and BAC agree now to a particular interpretation is irrelevant to an otherwise clear evidentiary record.

BankTrade License had already occurred.  It had not.  That it could have occurred is irrelevant.

## CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is granted, and defendant's motion for summary judgment is denied.

Defendant's remaining defenses shall be addressed by a separate order.

The Clerk of Court is directed to terminate the motion at ECF No. 159.

SO ORDERED.

Dated:     New York, New York
           June 21, 2013

_____
KATHERINE B. FORREST
United States District Judge

22