UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
COMPLEX SYSTEMS, INC.,                     :
                                           :
                    Plaintiff,             :
                                           :         08 Civ. 7497 (KBF)
         -v-                               :
                                           :         OPINION & ORDER
ABN AMBRO BANK N.V.,                       :
                                           :
                    Defendant.             :
------------------------------------------------------- X

KATHERINE B. FORREST, District Judge:

This Opinion & Order seeks to provide both clarity and finality on the issue

of liability in this long-pending and confused copyright infringement action.[1]  For a

time, the Court itself was a victim of the confusion that has been rather pervasive

in this action.  Finally, however, the parties' numerous submissions have provided

the Court with much-needed clarity.  The proverbial light bulb has finally been

illuminated.

For the reasons set forth below, the Court hereby GRANTS summary

judgment in favor of plaintiff, Complex Systems, Inc. ("CSI"), as to its claims and as

to all defenses raised by defendant, ABN AMRO Bank N.V. ("ABN").


PROCEDURAL HISTORY

Only a few decisions from this Court are necessary to understand this Court's

determination of liability:  the instant decision, the Corrected Opinion & Order

---

[1] This matter was originally filed in 2008; it was transferred to the undersigned on
November 29, 2012.  (ECF No. 180.)

dated June 21, 2013 (see 6/21/13 Order, ECF No. 257), and the Memorandum

Decision & Order dated August 9, 2013 (see 8/9/13 Order, ECF No. 280.)

The copyrighted work at issue in this case is the BankTrade 8.0 software

product ("BankTrade" or "the Work"). CSI is the sole claimant in a duly registered

copyright in the Work. (See Amend. Compl. ¶¶ 47, 48, dated Dec. 29, 2008, ECF

No. 16).[2] ABN is a financial institution that has been using the Work. (Id. ¶¶ 25-

28.) CSI alleges willful copyright infringement. (Id. ¶ 28.) In response, ABN

asserts, in the alternative, a variety of defenses: (1) that it had an assignment to

the Work from a former, licensed subsidiary, ABN IT ("IT") (the Court granted CSI

summary judgment on this claim) (see 6/21/13 Order); (2) that IT impliedly

authorized ABN to use the Work after IT "acquired co-ownership rights;" (3) that

ABN received an express license from CSI to use the Work; or (4) that ABN had an

implied right to use the Work based on CSI's conduct.[3] (See Def.'s Mem. Opp'n to

[CSI's] Mot. Summ. J., at 1 ("Def.'s Mem."), dated May 10, 2013, ECF No. 212.)

---

[2] The operative Copyright Registration is dated August 27, 2008. It lists CSI as the "Author" and "Copyright Claimant." (See Declaration of John C. Garces, Esq. ("Garces Decl."), Ex. 3, dated February 3, 2009, ECF No. 19.) IT is listed as an additional author, as is discussed at length supra.

[3] On August 26, 2013, ABN submitted a letter providing a "recap" of ABN's remaining affirmative defenses. (See Def.'s 8/26/13 Ltr. at 2-3, ECF No. 283.) That recap ignores certain defenses (e.g., failure to state a claim or waiver; but, those defenses lack no merit as determined herein). In addition to the affirmative defenses listed above, ABN also asserts estoppel, explaining: "Even assuming ABN was not authorized to use BankTrade, CSI is estopped from asserting an infringement action against ABN because CSI knew of, actively facilitated, and profited from ABN's implementation of BankTrade throughout its global network of banks." (Id. at 3.) This argument lacks merit. There is no basis for any assertion that CSI has engaged in any of the type of conduct that would amount to facts giving rise to estoppel. See Barksdale v. Robinson, 211 F.R.D. 240, 245 (S.D.N.Y.

Given the co-ownership argument ABN asserts as a predicate fact to IT's alleged authorization of its use of BankTrade, a particularly interesting moment in the procedural history of this matter occurred in November 2008. Fully aware of the August 2008 copyright registration, ABN moved to dismiss the action on the basis that the copyright registration for the Work was invalid. (See Def.'s Mot. to Dismiss, dated Nov. 17, 2008, ECF No. 10; Def.'s Mem. in Supp. Mot. to Dismiss, dated November 17, 2008, ECF No. 11.) ABN argued that BankTrade 8.0 was, in fact, not a new work, but rather, a combination of prior versions of the BankTrade software "that date back to the early 1990's." (See Def.'s Mem. in Supp. Mot. to Dismiss at 4.)

In that motion, ABN articulated a different position than that to which it later pivoted: rather than arguing that ABN had received from IT an assignment of the relevant license agreement between CSI and IT, ABN instead argued that "ABN has operated and continues to operating within the scope of very broad license rights that [CSI] granted to ABN and its related entities." (See id. at 1, n.2

2002) (citations omitted) (explaining that "[e]quittable estoppel may toll the limitations period where the plaintiff knew of the existence of the cause of action, but the defendant's misconduct caused the plaintiff to delay in filing suit"). No such facts are present here. CSI has been actively pursuing its rights since shortly after the sale of IT to Bank of America ("BAC"). Indeed, IT and ABN raised the issue of license transfer with CSI – and it became clear not only that CSI did not waive its rights, but that the Royal Bank of Scotland ("RBS") and the Citizens Financial Group, Inc. (together for ABN) believed obtaining the rights from CSI would cost a significant sum. (See e.g., Decl. Jeffrey I. Kaplan Supp. of Plaintiff's Combined Mem. Opp'n to ABN's Mem. Summ J. & in Supp. CSI's Mot. Summ. J. ("Kaplan 8/3/12 Decl."), dated Aug. 3, 2012, Ex. L at 4.).) There is no showing of conduct by CSI that could have misled ABN into believing it had consented to its use of BankTrade post-sale of IT or that it had waived its right to seek a licensing fee or sue for infringement. On such facts, ABN's estoppel defense lacks merit.

(emphasis added).) ABN argued that CSI's licensing of BankTrade to "many large international banks" was an example of prior publication rendering the copyright invalid and that "[t]he Deposit Materials further demonstrate that the BankTrade software is related to preexisting versions of the BankTrade software." (Id. at 9, 10.) "In the Deposit Materials, under the heading 'WSTRACE.CBL,' [CSI] identifies versions of the BankTrade software or portions thereof that span between 1994 and 2003." (Id. at 10.) ABN argued that: "[t]hose preexisting versions of the BankTrade software are the foundation of [CSI's] allegations of copyright infringement and were not included in the Registration." (Id. at 11 (emphasis added).)[4]

Further, while reserving the right to later change its position, ABN stated that it was not challenging CSI's ownership of the work as set forth in the registration.[5] (Id. at 2, n.4.) As set forth in the recitation of facts below, ABN's litigation position – set forth clearly in its Motion to Dismiss (when the events were

---

[4] Following this Court's now vacated initial denial of summary judgment to CSI, CSI moved to amend the Complaint to add pre-existing versions of BankTrade. (See ECF No. 289.) There is no doubt that ABN has understood from the outset – and itself asserted – that prior versions of BankTrade comprised what is now referred to in its copyrighted form as "8.0." Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 747 (2d Cir. 1998) (explaining that "because [plaintiff] is the owner of the copyright of both the derivative and pre-existing work, the registration certificate relating to the derivative work in this circumstance will suffice to permit it to maintain an action for infringement based on defendants' infringement of the pre-existing work") (citations omitted). There is no need to amend the Complaint when the current version of BankTrade, according to ABN itself, is largely based on prior versions of the software.

[5] ABN stated: "ABN notes that only Complex is identified as copyright claimant. At this time, ABN does not challenge the stated ownership of the registered work. However, discovery is likely to reveal that ABN is a co-owner of the registered BankTrade software." (Def.'s Mem. in Supp. Mot. to Dismiss at 2, n.4.) ABN of course has never been able to make such a showing.

closer at hand) – is inconsistent with its current position.[6] ABN's earlier position is, in fact, consistent with IT as a licensee of the Work owned by CSI – not IT as itself an owner or licensor.

In March of 2013,[7] this Court granted summary judgment for CSI on the primary defense pursued by ABN: that its former subsidiary, IT, which was CSI's licensee, had assigned its license to ABN prior to ABN's sale of IT to LaSalle Bank on April 22, 2007. (See 3/20/13 Order.) The Court ruled that no assignment had ever occurred and that ABN's proffered "evidence" of an assignment was a post hoc attempt to fix a rather inconvenient problem of continuing use of the Work when ABN and CSI had been unable to reach acceptable commercial terms post-sale. (See 6/21/2013 Order.)

This ruling did not, however, fully resolve the case. Procedurally, the parties were in a confused place: ABN had moved for "partial summary judgment" solely on its defense of assignment, and CSI had cross-moved for "summary judgment" on

---

[6] In light of subsequent events and with the benefit of retrospect, the arguments contained in the Motion to Dismiss are surprising. In its motion, ABN argued that the copyright registration relied upon by Plaintiff was deficient. Later, ABN argued that the copyright registration was valid and that, among other things, IT was a co-author/owner of the Work. Counsel for ABN submitted a Declaration on July 10, 2013 (see Declaration of John C. Garces in Support of ABN AMRO Bank N.V.'s Supplemental Memorandum of Law in Opposition to Complex Systems, Inc.'s Motion for Summary Judgment on Liability ("Garces 7/10/13 Decl."), dated July 10, 2013, ECF No. 267), which attempted to explain Defendant's rationale for its Motion to Dismiss.

[7] A Corrected Opinion was issued on June 21, 2013. (See ECF No. 257.)

the same issue. (ECF Nos. 159, 172.)[8] Left unresolved were ABN's remaining

defenses. ABN had not purported to move as to those defenses – and nothing in its

papers indicated an intentional relinquishment of them. For its part, CSI's papers

read as a direct counter to ABN's ("you don't get summary judgment on that issue,

we do"), and similarly did not address ABN's remaining defenses. Theoretically, the

Court could have ruled that by failing to raise its remaining defenses in opposition

to CSI's motion for summary judgment, ABN waived those defenses. See, e.g.,

Johnson v. Board of Regents of Univ. of Ga., 263 F.3d 1234 (11th Cir. 2001)

("Intervenors cannot readily complain about the entry of a summary judgment order

that did not consider an argument they chose not to develop for the district court at

the time of the summary judgment motions."); Frankel v. ICD Holdings S.A., 930 F.

Supp. 54, 64 (S.D.N.Y. 1996) (explaining that while defendants were "entitled" to

raise a defense, that "does not mean that they have done so in a manner sufficient

to defeat plaintiffs' motion for summary judgment"); Dollar Dry Dock Sav. Bank v.

Hudson St. Dev. Assocs., No. 92 Civ. 3737, 1995 WL 412572, at *5 (S.D.N.Y. July

12, 1995) (stating that the burden is on the defendant to adduce evidence

supporting an affirmative defense, not upon the movant to negate its existence);

Harper v. Delaware Valley Broadcasters, Inc., 743 F. Supp. 1076, 1090-91 (D. Del.

1990), aff'd, 932 F.2d 959 (3d Cir. 1991) (same); Security Pac. Mortg. & Real Estate

Servs., Inc. v. Canadian Land, 690 F. Supp. 1214, 1219 (S.D.N.Y. 1988), aff'd, 891

---

[8] The parties initially filed motions for partial summary judgment back in the
summer of 2009. However, on November 17, 2009, the Honorable Leonard B. Sand
deferred a decision until discovery was completed. (See ECF No. 66.)

F.2d 447 (2d Cir. 1989) ("The requirements of pointing to specific contested facts in opposing a motion for summary judgment are particularly elevated where the nonmoving party would bear the burden of proof at trial on [an] affirmative defense . . . ."). However, the record was sufficiently muddled as to whether anyone intended those defenses to have been at issue in the motions – and ABN argued that it should be provided an opportunity to raise them; hence, the story continued anon.

Following a conference during which ABN stated it sought to pursue its remaining defenses, CSI promptly again moved for summary judgment. (See ECF No. 202.) That motion is currently pending before this Court and is the subject of this Opinion & Order.

The briefing and argument on CSI's instant motion has a mini-history of its own – with the Court and the parties having to weave their way through the various relationships between the parties, the relationship of CSI to ABN's former subsidiary IT prior to the sale of IT to BAC, the issue of whether IT itself ever asserted any ownership rights to Bank Trade 8.0 (or can do so now), and the issue of whether ABN can assert IT's ownership rights on IT's behalf as a predicate to asserting "authorization" by IT based on those rights. Finally, the Court has had to thread through the tall grass of ABN's changing arguments.

After further briefing and a misunderstanding by this Court as to the possible impact of a Professional Services Agreement ("PSA") entered into in 2000,[9] the applicable statute of limitations as to certain claims, and ABN's standing (or lack thereof) to raise certain claims, the Court initially denied the instant motion for summary judgment. (See ECF No. 280.) However, following additional briefing, it became clear that CSI was correct in its legal position on summary judgment – and that a ruling granting its motion was appropriate. Hence, the Court vacated its decision denying summary judgment. (See ECF No. 307.) This Opinion & Order grants CSI summary judgment on liability.

## FRAMING THE ISSUE DISPOSITIVE OF LIABILITY

ABN's remaining defenses rely on one of three alternative theories: (1) that IT acquired sufficient ownership rights in the Work to authorize ABN to use the Work, and that it in fact authorized ABN to use the Work; (2) that CSI expressly authorized ABN to use BankTrade in a maneuver that survived the sale of IT to BAC; or (3) that CSI granted ABN an implied license to use the Work through its conduct. (See Def.'s Mem. at 1.) According to ABN, resolution in its favor as to any one of these theories requires a denial of CSI's motion.

---

[9] In the PSA, it appears that CSI granted to IT an "unrestricted, perpetual, fully-paid license to use" the Work, and additionally, declared portions of the Work potentially falling within the work for hire doctrine. (See 6/21/2013 Order at 4 (citing § 5.1 of the PSA (Kaplan 4/26/13 Decl., Ex. 1, dated Apr. 26, 2013, ECF No. 204-1; Crescenzi Decl., Ex. A, dated May 10, 2013, ECF No. 211-1)).) Since this work for hire issue had not before been properly presented to the Court, additional information was needed. Accordingly, the Court Ordered the parties to provide supplementary briefing on the impact of the PSA.

Neither party has proffered evidence that IT itself ever formally sought actual ownership rights in the Work, such that it had any right to authorize a third party's use. Put differently, there has never been a moment when IT – which, of course, is not a party to this litigation – has requested or had its ownership rights adjudicated. (See supra.) Indeed, as CSI correctly notes, IT's assertion that it has some "authorship" (notably, as discussed below, not "ownership") not only comes years late, but it cannot change the outcome of this litigation.[10] CSI has put forward controlling authority showing that it is too late for IT to now seek any ownership interest; CSI obtained a copyright registration in the Work in 2008; in that registration, it plainly and clearly listed itself as "claimant;" as a matter of copyright law, those facts, combined with the passage of time, mean that the action is now in a "game over" posture, not a "game changing" one.[11]  (See supra.)

Whether IT could have once, long ago, asserted ownership rights to BankTrade 8.0 (by virtue of its position as an "author" of some code), is now an irrelevant detour: it did not.  Perhaps IT never sought ownership rights because it did not need to – it had the original license with CSI, and it did not lose or assign away its rights prior to its sale to BAC; perhaps it simply did not understand that it may have had such rights.  As a matter of law, in this lawsuit between CSI and ABN, the answer to these questions is irrelevant.  IT is not a party to this case and

_____

[10] The Court initially had an erroneous view of the law and believed that even a belated assertion of ownership rights by IT, a non-party, could be a "game changer." (See 6/21/2013 Order.)  That view was legally incorrect as discussed supra.
[11] Notably, ABN is not seeking to argue that CSI does not in fact have ownership rights.

the law is clear that ABN lacks standing to assert (and then take refuge in) IT's time-barred position as to rights it may once have had.[12]


## RELEVANT FACTS

Few facts are required for resolution of this motion. Those that the Court recites below are either undisputed or indisputable.

I.  1997 License Agreement Between CSI and IT

On November 1, 1997, CSI and IT entered into a license agreement (the "1997 License Agreement" or "License Agreement") for BankTrade. (See Kaplan 8/3/12 Decl., Ex. A.) There has never been any argument that IT had, or could have had, any interest in BankTrade as it existed in 1997. (This must be understood against the backdrop of ABN's subsequent position in its Motion to Dismiss that CSI initially licensed to ABN the 1997 software and then licensed subsequent versions thereafter without having obtained a valid copyright over BankTrade.) (See Def.'s Mem. in Supp. Mot. to Dismiss at 6.)

The 1997 License Agreement defines ABN AMRO Information Technology Services Company, Inc. ("IT") as the Licensee. (See Kaplan 8/3/12 Decl., Ex. A at 1.) The President of IT executed the agreement. (Id. at 10.)

The License grant states:

> [CSI] hereby grants and Licensee hereby accepts a
> perpetual, non-transferable, non-exclusive license to use

---

[12] Ordinarily, the Court would address the issue of standing at the outset. Given the unique posture of this case and the logical progression of the parties' arguments, however, standing is addressed later in this Opinion.

> [CSI's] BANKTRADE software system ('the System') . . . .
> The products licensed under this Agreement may be
> utilized for the benefit of the Licensee, <u>its</u> subsidiaries,
> affiliates and any direct or indirect parent or any
> subsidiary or affiliate of such parent.

(<u>Id.</u> ¶ 1 (emphasis added).)  The Scope of Use states that the licensee has no right to copy the System except as provided.  (<u>Id.</u> ¶ 2.)  The License Agreement provides that enhancements delivered by CSI "shall be deemed to be part of the System upon use acceptance of said enhancements, and all terms of [the] Agreement shall govern the use of such enhancements." (<u>Id.</u> § 5.)

Additionally, the License Agreement clearly states:  "The System and all documentation, and all copies thereof, are propriety to [CSI].  All applicable rights to patents, copyrights, trademarks and trade secrets in the System or <u>any modification</u> made at Licensee's request are and shall remain in [CSI] . . . .  This Section 9 will survive the expiration or termination of the Agreement." (<u>Id.</u> § 9 (emphasis added).)  The Agreement goes on to provide for the fact that IT has the right to assign BankSystem to mentioned entities of IT without the consent of CSI.  (<u>Id.</u> § 20.)

II.   <u>Addenda to the 1997 License Agreement Between CSI and IT</u>

CSI and IT entered into two addenda to the License Agreement:  one in June 2001 and another on July 19, 2002.  (<u>See</u> Kaplan 8/3/12 Decl., Ex. A.)  Those addenda provide for broader geographic scope of use; both addenda state that except as specified, the License Agreement shall not be amended or modified and shall continue in full force and effect.  (<u>Id.</u> at 1.)  Both addenda are signed by CSI and IT.

Thus, the provisions of the 1997 License Agreement relating to assignment and ownership of modifications are incorporated unchanged into each amendment.

III.   Professional Services Agreement Between CSI and IT

In July 2000, CSI and IT entered into a professional services agreement ("PSA"), providing that CSI would provide certain customization services to IT with respect to BankTrade, in exchange for fees. (See Crescenzi Decl., Ex. A.) CSI, which is defined as "the Company," is tasked with providing IT with computer consulting services as set forth in various work orders. (See id. § 1.)

Section 5.0 of the PSA provides:

OWNERSHIP OF WORK PRODUCT AND WARRANTIES

> 5.1 Unless otherwise provided in a specific Work Order, Company [i.e., CSI] agrees that all materials, information, and deliverables ("Work Product") including, without limitation, software, modified software . . . that is created, developed, or modified by Company or any Consultant pursuant to Work Orders hereunder, shall be and remain the sole property of the Company. Company grants to [IT][13] an unrestricted, perpetual, fully-paid license to use such Work Product. To the extent that any such Work Product falls within the definition of ["]work made for hire" under 17 U.S.C. § 101, such Work Product shall be deemed ["]work made for hire" and [IT] shall be deemed the author and sole, exclusive owner thereof, including the sole, exclusive owner of all copyrights therein. To the extent any Work Product does not fall within the definition of ["]works made for hire" under 17 U.S.C. § 101, Company hereby assigns, all its rights, title, and interest in and to such Work Product to [IT] and shall assist [IT] in all reasonable ways to protect and defend its rights in and to the Work Product.

---

[13] The PSA refers to IT, or ABN AMRO Information Technology Services Company, as "ABN AMRO."

> 5.2 Any property delivered by the Company under this Agreement that was owned or developed by Company prior to its engagement hereunder remains the exclusive property of Company, however, to the extent any such property is incorporated into Work Product delivered hereunder, Company grants [IT] a non-exclusive worldwide, paid up, perpetual license to use, copy, and modify such property as integrated into any Work Product for [IT's] own purposes. Company retains the right, without limitation, to use its knowledge, experienced, and know-how including processes, ideas, concepts, tools, and techniques developed in the course of performing this Agreement.

(Id. §§ 5.1, 5.2.) ABN argues that pursuant to the PSA, CSI modified BankTrade 8.0 pursuant to Work Orders from IT and that as a result, IT has "independently copyrightable contributions to BankTrade." (See Defendant ABN AMRO Bank N.V.'s Memorandum of Law in Opposition to Complex System Inc.'s Motion for Summary Judgment on Liability ("Def.'s Opp'n") at 17, dated May 10, 2013, ECF No. 212.)[14]

IV.   Correspondence Between CSI and IT

Five years later – and following IT's ongoing licensing of the Work with the 2001 and 2002 addenda to the License Agreements – CSI and IT exchanged correspondence. That correspondence expresses a clear desire by IT to terminate a maintenance services agreement relating to the work, but an explicit desire not to terminate the 1997 License Agreement. (Decl. of Gad Janay ("Janay Decl."), Ex. A, dated July 22, 2013, ECF No. 272.) For example, contained in that correspondence

---

[14] As discussed repeatedly herein, this argument by ABN is a hollow one when any rights would be IT's; and IT has not sought to intervene in this action or sought itself any formal declaration of rights.

is a letter dated September 23, 2005 from IT's Chief Information Officer, Bruce A.

Jacobs, to Gad Janay, Chairman & CEO of CSI, that says, "effective January 1,

2006, [IT] desires to terminate the maintenance services agreement . . . . Please be

further advised that [IT][15] does not wish to terminate the [1997 License] Agreement

or any licenses obtained pursuant thereto . . . ." (Id.)

On October 26, 2005, Janay responded to Jacobs that "[a]s annual

maintenance is an integral part of the Agreement as amended, [IT] cannot just

cancel one of its provisions. If [IT] wishes to cancel the License Agreement, it must

remove the BankTrade software system and the Global Processing Component from

its central processing units as of the effective date of termination, January 1, 2006."

(Id.) On November 4, 2005, Jacobs wrote back to Janay stating IT's "positions" with

respect to the 1997 License Agreement:

> A.  [IT] was granted a perpetual, non-transferable, non-
> exclusive license to use Complex's BankTrade Software System
> which included access to the source code for same. . . . The
> license granted by Complex contains no provision indicating that
> the license was in any way conditional or contingent upon [IT's]
> purchase of maintenance services from Complex or otherwise.
>
> ...
>
> D.  [IT] is not terminating the Agreement or any part thereof.
> That is not its intent and termination of the Agreement was
> never a stated goal. Instead, it is simply declining Complex's
> offer to continue providing maintenance services. In effect, [IT]
> is relieving Complex from its ongoing maintenance obligation.

---

[15] Here again, the correspondence refers to "ABN AMRO," but "ABN AMRO" is
defined as an abbreviation for ABN AMRO Information Technology Services
Company, Inc., to which the Court refers as IT.

> E. [IT] intends to continue using the BankTrade System
> pursuant to the perpetual license for which it paid substantial
> licensing fees.

(Id.) Thus, when IT signed the addenda in 2001 and 2002, and similarly, in 2005,

IT acted as Licensee of BankTrade, not as an _owner_ with separate rights to

BankTrade.

Efforts to customize BankTrade to meet IT's "business and technical

requirements" occurred for several years. (See Crescenzi Decl. ¶ 7.) Raymond

Crescenzi, a former employee of IT, was a Client Delivery Manager who provided

technology-related and operational services for IT's parent, ABN. In a declaration,

he states: "It is my understanding that CSI's general release of BankTrade 8.0

included ABN IT's enhancements and modifications to the BankTrade code." (Id. ¶

28.) While ABN uses Crescenzi's Declaration to support its contention that IT has

an interest in BankTrade 8.0, it alternatively supports the premise that CSI is an

owner that did not need permission from IT to modify the Work; it also supports

knowledge and awareness by IT of CSI's assertion of sole ownership by virtue of the

inclusion of such modifications in 8.0. There is no evidence that IT ever objected to

such an assertion.[16]

---

[16] Insofar as ABN is concerned, there is no evidence Crescenzi would or did have
sufficient authority on behalf of IT to _license_ any rights IT may have theoretically
had, or that he had the authority to otherwise "authorize" ABN to use BankTrade.
The evidence relating to Crescenzi is that he was a technical employee who worked
with the provision of technology services. He was not a signatory of the PSA, the
1997 License Agreement, or the two addenda.

V.    Sale of IT to BAC

On April 22, 2007, ABN BAC entered into a Purchase and Sale Agreement ("Sale Agreement"), pursuant to which ABN would sell its United States retail banking business to BAC (the "LaSalle Transaction.") (See Kaplan 8/3/12 Decl., Ex. D.) When ABN sold IT to BAC, it transferred all aspects of the "Business" of its North American unit, which included its subsidiary, IT. (See Pl.'s Mem. at 4; Kaplan 8/3/12 Decl., Ex. D at 2.) Business was defined simply as "the businesses of the Company [defined as ABN AMRO North America Holding Company], other than the Excluded Business or any Divested Business." (Id.) IT is set forth on Schedule 3.1(b) of the Sale Agreement as among the Subsidiaries of ABN AMRO being transferred to BAC. (See id., Ex. D, Schedule 3.1(b) at item 62.)

BAC and ABN entered into a Transition Services Agreement ("TSA") that provided for a transitional period during which each company would be able to provide or receive necessary services from the other. (Crescenzi Decl. ¶ 31.) While BankTrade was identified in Annex 1(a)(vii) to the TSA as "owned" by ABN (id. ¶ 32), there is no evidence in the record that anyone ever thought of, let alone executed, an assignment of the license between CSI and IT to ABN. (See 6/21/13 Order at 21.) In addition, there is no evidence in the record that any party was contemplating that IT had any ownership interest in any of the modifications to the application that had been made pursuant to the PSA. Instead, the only evidence is that as a transitional matter, following closing, the application continued to reside physically with IT (now BAC). (See Crescenzi Decl. ¶ 34.) BAC/IT subsequently

allowed ABN to move the BankTrade software from Chicago to two data centers located in the United Kingdom. (Id.) The migration was completed as of April 2009. (Id. ¶ 35.) According to Crescenzi: "Since that time, ABN has been operating the BankTrade software from the UK locations." (Id.)

Subsequent to the sale of IT to BAC, ABN and BAC engaged internal and external communications regarding assignment of the CSI/IT License Agreement to ABN.[17] (See Kaplan 8/3/12 Decl., Ex R ("[w]e are at the mercy of BAC to assign these contracts back to [ABN]..."); id., Ex. T ("[r]equested [a]ssignment from BAC to be completed by end of August [2008]"); id., Ex. F (BAC stating to CSI that the BankTrade license "remains with the contracting LaSalle entity [i.e., IT] (which entity is among those bought by Bank of America"); id., Ex L (an ABN March 2008 email from Ray Crescenzi states: "As you all know, BAC still owns the BankTrade software. BAC has stated that they will not be off version 6.2 until October [2008] nor will we [ABN] look for BAC to assign this contract to [ABN][18] until such time later this year"); id., Ex. H (an RBS attorney explicitly states that the License Agreement was between CSI and IT, and that ABN was not a party to that agreement); id., Ex. G (On April 11, 2008, someone from Citizens Bank (i.e., RBS) wrote to CSI that "we confirmed with you [i.e., CSI] that BAC as successor in interest to [IT] is currently the licensee under the License Agreement, all addenda

---

[17] Some of the documents that illustrate this point refer to IT as "ABN AMRO Services Company, Inc.," which formerly was called "ABN AMRO Information Technology Services Company, Inc." (See Kaplan 8/3/12 Decl., Ex. DD, ¶ 4.)
[18] Here, Crescenzi refers to ABN as "AANA," which under Crescenzi's signature is set forth as ABN AMRO North America – IT. (See Kaplan 8/3/12 Decl., Ex. L.)

thereto, and the subsequent [agreement. We] would like to assign the Agreements back to ABN."); id., Ex. X (In June 2008, ABN wrote that "BAC will provide the Right to Use [to ABN] for the [CSI] contract after they are off BankTrade in October [2008]. . . . CSI is expected to require a significant amount in fees for this assignment. ABN will be responsible for these fees. The lawyers from BAC and RBS both agree that we [ABN] are not currently in breach of the contract held by BAC and that BAC can't assign the contract [to ABN] without consent from CSI.")[19]

ABN and CSI's licensing discussions did not result in an agreement.

VI.   CSI's Copyright Registration

On August 27, 2008, CSI obtained a copyright registration for BankTrade 8.0; CSI is listed as the sole claimant. (See Garces Decl., Ex. 3.)  IT is listed on the registration as an additional "author" by virtue of "[w]ork made for hire." (Id.)[20]  In August 2008, CSI threatened IT with suit for copyright infringement, allegedly following a series of events in which CSI alleges that ABN had told it that IT had assigned the 1997 License Agreement to ABN. (See Kaplan 8/3/12 Decl., Exs. H, I.)

---

[19] As discussed at length in the Court's June 21, 2013 Opinion & Order, the evidence supporting ABN's position that there had been an assignment of rights was wholly inadequate. As an additional example, a Senior Vice President at BAC, Cynthia E. Murray, submitted a declaration for ABN. (See Kaplan 8/3/12 Decl., Ex. CC.) Murray stated that she worked for ABN prior to working for BAC, and that in her role at ABN, "she understood that ABN and BAC allocated the license to the BankTrade software to ABN" as part of the LaSalle Transaction. (See id. ¶ 4 (emphasis added).) Murray did not work for IT; she states only that she "understood" that the BankTrade license had been allocated to ABN; she does not state how she understood that and in any event, allocation is not an assignment.
[20] CSI did certain "work," for which it was paid by IT.

On August 25, 2008, CSI sued ABN, alleging that ABN has continued to use the BankTrade software despite the absence of a valid assignment or license. (See Compl., dated Aug. 25, 2008, ECF No. 1.) On December 29, 2008, the First Amended Complaint was filed. (See Amend. Compl., dated Dec. 29, 2008, ECF No. 16.)[21]

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is warranted if the pleadings, admissible discovery materials, and declarations setting forth statements that would themselves be admissible at trial demonstrate that there is no genuine issue of fact necessitating trial. Fed.R.Civ.P. 56; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of demonstrating the absence of a genuine issue of fact. Id. at 323. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once a moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 256 (2d Cir.

---

[21] IT appears that ABN and IT may have entered into an indemnity agreement that relates to this lawsuit in 2008. (See Def.'s Opp'n at 23 (citing Kaplan 8/3/12 Decl., Ex. FF ¶ D(2)).)

2009); see also Price v. Cushman & Wakefield, Inc., 808 F.Supp. 2d 670, 685 (S.D.N.Y. 2010). To defeat summary judgment, a party may not rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment" as "[m]ere conclusory allegations or denials . . . cannot themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baine, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F.Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative facts and specific evidence showing that there is a genuine issue for trial.").

A genuine fact issues exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (citing Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)). Where it is clear that no rational trier of fact could find in favor of the non-moving party, summary judgment is warranted. Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).

ANALYSIS

I. <u>ABN's Assertion that IT Is a Co-Owner of the Work</u>

    a. <u>IT Has Not Asserted that It Has Ownership Rights in the Work</u>

        i. <u>IT Has Failed to Assert that it is a Joint Author of the Work</u>

ABN argues that "the record is clear and uncontradicted that [IT] is a co-author of a joint work in BankTrade . . . ." (Def.'s Opp'n at 13-20.)[22] Even if this were so, it would not change the outcome of the instant motion.

A joint work of authorship is "a work prepared by two or more authors with the <u>intention</u> that their contributions be merged into an inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The intent is measured at the time the work in question is created. <u>Childress v. Taylor</u>, 945 F.2d 500, 506 (2d Cir. 1981) (citing H.R. Rep. No. 1476, 94th Cong., 2d Sess. 120 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 5659; S.Rep. No. 473, 94th Cong., 2d Sess. 103 (1975) (explaining that "[t]he touchstone [for a joint work] is the <u>intention, at the time the writing is done,</u> that the parts be absorbed or combined into an integrated unit . . .")). Additionally, the contributing authors must intend to be joint authors – it is

---

[22] As "evidence" of this assertion, ABN relies upon: (1) the corrected Certificate of Registration for BankTrade filed with the Copyright Office by CSI on August 27, 2008, which identifies IT as a co-author of BankTrade; and (2) the unsupported allegation that "CSI does not dispute that [IT] intended for ABN to use BankTrade after the LaSalle Transaction closed." (Def.'s Opp'n at 14.) Additionally, ABN relies on the fact that IT made independent contributions to BankTrade by customizing the source code to satisfy ABN's banking needs and that IT issued work orders and paid CSI to effectuate modifications pursuant to the PSA. (<u>See id.</u> at 13-20.) None of this addresses any ownership issues in the Work.

not enough that they intend to merge their contributions into a single work. Id. at 508; Papa-Jane's Music, Inc. v. McLean, 921 F.Supp. 1154, 1157 (S.D.N.Y. 1996).

In this case, even were the facts to establish a joint work of authorship, IT would have had to timely assert such facts and seek to establish itself as having – by virtue of authorship – any ownership rights to BankTrade. Such a preliminary step is necessarily required before any further action could be taken by a third party (ABN) based on such (potential) rights. See Cambridge Literary Props. Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. KG, 510 F.3d 77, 84 (1st Cir. 2007) (rejecting plaintiffs' position as framing the argument in a manner that assumes that the question of ownership has been resolved when it had not; the claimant in a copyright interest had failed timely to seek an adjudication establishing such interest and was therefore barred from remedies premised on such an interest existing).

Here, the 1997 License Agreement provided that CSI had the option of choosing to incorporate additional changes or modifications made by IT; there was no requirement that it do so. (Kaplan 8/3/12 Decl., Ex. A, § 12.) This does not evince that CSI and IT had the intent to be "joint authors" of BankTrade 8.0. This is particularly true in light of the fact that ABN focused on the amount of pre-existing material in BankTrade 8.0 when it made its Motion to Dismiss the Complaint on the basis that the Work was a compilation of prior versions of the software (and, according to ABN, had therefore been previously been published.)

(See Def.'s Mem. in Supp. Mot. to Dismiss at 5-7.) Those facts are not suggestive of a significant enough contribution to be considered a joint work.

In addition, the PSA – which both parties agree resulted in modifications and customization to BankTrade – did not require that CSI incorporate those modifications in new releases. Section 5.2 of the PSA provides that "to the extent" material is included, IT is granted a "license." (See ECF No. 211, Ex. A § 5.2.) There is no demonstrated intent (or triable issue) here to become "joint authors." At most, there is language in the PSA which provides that certain Work Product may constitute a "work for hire" – and in such situation, would be treated as such by CSI. (See id. § 5.1.)[23] A "work for hire" concept as to the specific Work Product (which could merely be a module of an application; it by no means the entire application) is not equivalent to the concept of "joint work of authorship." See, e.g., 17 U.S.C. § 101.

Moreover, undermining any claim that IT's modifications significantly impacted BankTrade 8.0 is the fact that in ABN's Motion to Dismiss, it argued that BankTrade 8.0 is derived primarily from prior version of the software, over which IT has no possible authorship claim. Not only that, as is discussed below, to the

---

[23] To the extent that ABN relies on the copyright registration because it lists IT as an additional "author," that fact is inapposite. According to the Declaration of Michael R. Gilman, who was responsible for filing the copyright registration for BankTrade 8.0 (see Declaration of Michael R. Gilman, Esq. ("Gilman Decl.") ¶ 2, dated July 22, 2013, ECF No. 271), IT was included as an additional author on the copyright registration because he understood the Work to have "included some additional lines of code that had been written by employees of [IT] . . . ." (Id. ¶¶ 4, 7.) As discussed supra, IT has never asserted its ownership of those "lines of code," nor any other component of the Work.

extent that IT believed it had co-authorship rights in BankTrade 8.0 because of its modifications, IT did nothing to convert any authorship into ownership.

Co-authorship is a sideshow without meaning in this case.[24]

ii. IT Has Failed to Assert that It is a Co-Owner of the Work

ABN's Answer asserts joint ownership as its Fourth Affirmative Defense. (See Def.'s Ans. at 10, dated May 4, 2009, ECF No. 27.) That defense states: "Plaintiff's alleged claims are barred in whole or in part as brought against a joint owner of the copyrighted work." (Id. at 10.) As its Third Affirmative Defense, ABN also asserts that IT as a joint owner of the Work. (See id.)

Certainly, ABN could never itself be a joint owner and it has not pursued that argument in opposition to Plaintiff's motion. There is no evidence in the record that this could be so: ABN was not a signatory to the 1997 License Agreement

---

[24] The Court readily acknowledges that the PSA has the potential to create confusion in this case. (Indeed, the Court's Aug. 9, 2013 Order (see ECF No. 280) is an example of such confusion.) Nonetheless, after substantial briefing on the issue, it is clear that the PSA is a side-show at this point in time – these many years later – it does not give rise to a valid claim of co-authorship, let alone co-ownership, on the part of non-party IT. First, there is no evidence in the record suggesting that IT contributed to BankTrade 8.0 in any substantial way; in fact, ABN's Motion to Dismiss undermines such an assertion insofar as it argues that BankTrade 8.0 is largely derived from prior versions of the software. Second, ABN asserts (on behalf of IT) full co-authorship of BankTrade 8.0, yet IT only made specific, discrete modifications under the PSA. ABN fails to specify the extent to which these modifications impacted the Work as a whole. Third, to the extent that IT's contributions are deserving of co-authorship rights (if at all), IT has for years failed to assert a claim for such authorship rights. For all of these reasons, in addition to the fact that IT is not a party to this litigation and ABN lack standing to assert IT's rights on its behalf (see supra), it is evident that the PSA does not create a triable issue of fact in this action.

pursuant to which modifications to the Work were made; nor was it a signatory to the PSA. The party with the direct relationship to CSI was IT.

With respect to IT, ABN's "joint ownership" defense is also necessarily without merit. First, it should be noted that as ABN has articulated this defense in opposition to Plaintiff's motion, the defense is not really "joint ownership" – rather, it is a two-step defense, claiming (1) an alleged joint owner (2) "authorized" ABN's ongoing use. It is fatal to this two-step defense that IT has never itself formally asserted ownership rights in BankTrade. While it is true that in connection with the Court's request for additional briefing on various issues, an individual from BAC, the current owner of IT, submitted a declaration stating: "BAC does not disagree with ABN AMBRO's position in this lawsuit that IT was a co-author of BankTrade 8.0 as a joint work" and that "BAC . . . [has] consented to, and BAC does consent to ABN AMRO's use of BankTrade" (see Declaration of John Boyaris in Support of ABN AMRO Bank N.V.'s Supplemental Mem. of Law in Opp'n to [CSI's] Mot. for Sum. J. on Liability ("Boyaris Decl.") ¶¶ 5, 6, dated Aug. 1, 2013, ECF No. 278-5 (emphasis added)), these statements are insufficient.

First, as discussed above, being a co-author is not equivalent to being an owner. See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547 (1985). Second, without any actual ownership interest, BAC's consent is (as discussed below) legally irrelevant. Whatever rights IT may once have been able to assert have withered away with the passage of time; the Boyaris declaration was too little too late. Moreover, in the Boyaris declaration, the most IT (now, BAC)

asserts is that "BAC does not disagree" with ABN AMRO's position "that IT was co-author of BankTrade 8.0 as a joint work." (Boyaris Decl. ¶ 5.) This is a weak assertion at best and is a far cry from established ownership rights.

Pursuant to 17 U.S.C. § 410(c), a copyright registration is prima facie evidence of ownership. See 17 U.S.C. § 410(c) (stating that "a certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate").

A party seeking to contest ownership must put forward specific evidence that rebuts the presumption of validity which attaches to a duly issue registration. Hamil Am., Inc. v. GFI, 193 F.3d 92, 98 (2d Cir. 1999). In this case, there is no dispute that CSI obtained a copyright registration to BankTrade 8.0 in August 2008.

According to the Copyright Office regulations, "[b]ased on both practical and legal considerations, these regulations are designed 'to make[ ] clear that the copyright 'claimant' for purposes of copyright registration is the author of the work for which registration is sought or a person or organization that has obtained ownership of all rights under the copyright initially belonging to the author.'" Morris v. Business Concepts, Inc., 283 F.3d 502 (2d Cir. 2002) (citing Interim Regulation: Part 202-Registration of Claims to Copyright, 43 Fed. Reg. 965 (1978)); see also Help: Copyright Claimant, www.copyright.gov/eco/help-claimant.html (last visited Oct. 15, 2013) (explaining that all known copyright claimant(s) shall be

identified in filing for a copyright and noting that "[t]he author is the original claimant and may always be listed as a claimant, even after the author has transferred rights in the work" and that "[t]he claimant may also be a person or organization to whom copyright has been legally transferred," but that "to be named as a claimant by means of a transfer, a person or organization must own all rights under the U.S. copyright law; ownership of only some of the rights is not sufficient").

For ABN's "joint-ownership" defense to work, IT must have established its ownership rights and then taken some affirmative act to authorize ABN's use of BankTrade 8.0 based on such rights. There is no evidence in the record that it did either, and the time for IT to establish any rights that it might believe it has – though, again, IT is not a party to this lawsuit – in BankTrade 8.0 has long passed. The law is clear that an action seeking to establish one's rights to a copyright must be brought within three years from the time a "reasonably diligent plaintiff would have been put on inquiry as to the existence of a right." <u>Netzer v. Continuity Graphic Assocs., Inc.</u>, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997) (reasoning that a claim for co-ownership of copyright was s time-barred because the claimant had previously received material with copyright notice showing only defendant as copyright owner) (citing <u>Stone v. Williams</u>, 970, F.2d 1043, 1048 (2d Cir. 1992), <u>cert. denied</u>, 508 U.S. 906 (1993)).

This three-year limitations period applies whether the claim is for co-ownership or co-authorship. <u>See, e.g.</u>, <u>Merchant v. Levy</u>, 92 F.3d 51, 52 (2d Cir.

1996) ("We agree with Defendants that Plaintiffs' claim seeking a declaration of co-ownership rights based on their co-authorship of [a work] is time-barred by the three-year statute of limitations . . . ."); <u>Cambridge Literary Props., Ltd.</u>, 510 F.3d at 86 ("The current Copyright Act treats determinations of the rights at issue here as questions of authorship status and initial ownership of copyrights . . . . There is a substantial federal interest in having the federal statute of limitations applied to these determinations . . . . Where an ownership claim arises under the Copyright Act, the Act's three-year statute of limitations likewise applies.") (citing <u>Gaiman v. McFarlane</u>, 360 F.3d 644, 653 (7th Cir. 2004)); <u>see also</u> <u>Santa-Rosa v. Combo Records</u>, 471 F.3d 224, 227 (1st Cir. 2006); <u>Price v. Fox Entm't Grp., Inc.</u>, 473 F.Supp.2d 446, 454 (S.D.N.Y. 2007) (explaining that "'plaintiffs claiming to be co-authors are time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration'" (citing <u>Merchant</u>, 92 F.3d at 56)); <u>Tomas v. Gillespie</u>, 385 F.Supp.2d 240, 243-44, 246 (S.D.N.Y. 2005) (stating that civil actions to establish ownership rights in a copyrighted work governed by the Copyright Act's three-year statute of limitations for all civil actions, found in 17 U.S.C. § 507(b); referring also to the Copyright Act's goal of enhancing predictability and certainty of copyright ownership) (citations omitted); <u>Barksdale</u>, 211 F.R.D. at 244 (holding that an action seeking a declaration of rights in a copyrighted work was time-barred since it was brought more than three years after the claim accrued).

In Cambridge Literary Properties, the First Circuit held that asserting claims that depend on the establishment of ownership rights are premature until such ownership rights have been established. 510 F.3d at 81. In Merchant v. Levy, the Second Circuit reversed a district court's decision to award a plaintiff an interest in a copyrighted work when the assertion of such interest occurred after the three year statute of limitations had expired. 92 F.3d at 56. There, the Court stated that suits seeking declarations of ownership interest were governed by 17 U.S.C. § 507(b) – providing for three years from the date of accrual. Id. The Court stated: "We hold that plaintiffs claiming to be co-authors are time-barred after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration. Our conclusion promotes the principles of repose integral to a properly functioning copyright market." Id. at 56-57 (internal citation omitted).

Accrual of a claim of ownership occurs when a would-be claimant knows or should have known of facts giving rise to potential rights. Merchant, 92 F.3d at 56; Stone, 970 F.2d at 1048. An author's attribution of a work solely to him or herself is evidence that he or she intended the work to be individual as opposed to joint. See Thomson v. Larsen, 147 F.3d 195, 203-05 (2d Cir. 1998) (explaining that because, among other things, defendant "retained decisionmaking authority over the final work, that he was billed as the sole author, and that he entered into written agreements with third parties as sole author," defendant was not a co-author with plaintiff); see also Price, 473 F.Supp. 2d at 458-59 (noting that the alleged co-

author's "claim under the Copyright Act of rights as a co-author of [the work] accrued when [the purported sole author] made an 'express assertion of sole authorship'") (citations omitted).

Here, the duly issued copyright registration put the world on constructive notice of CSI's copyright in BankTrade 8.0. See 17 U.S.C. § 205(c) (explaining that recordation of a document in the Copyright Office "gives all persons constructive notice of the facts stated in the recorded document . . ."); Latin Am. Music Co. v. The Archdiocese of San Juan of the Roman Catholic & Apolstolic Church, 499 F.3d 32, 40 (1st Cir. 2007) (explaining that a copyright registration provides constructive notice as to ownership claimed as well as the facts set forth in the registration itself) (citations omitted); Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc., 119 F.3d 55, 66 (1st Cir. 1997) ("A copyright registration certificate issued by and filed with the Copyright Office thus serves to put the world on constructive notice as to the ownership of the copyright and of the facts stated in the registration certificate."); Mason v. Jamie Music Pub. Co., 658 F.Supp. 2d 571, 588 (S.D.N.Y. 2009) (citing Latin American Music Company for the proposition that a copyright registration certificate in the Copyright Office provides constructive notice as to the ownership of the copyright and the facts stated in the registration certificate).

Thus, as of 2008 when CSI obtained its copyright registration for BankTrade 8.0, IT was on constructive notice that if it intended to assert rights to ownership, it needed to act.  It did not.

In fact, IT had actual notice of CSI's assertion of its rights. The record is clear that IT knew about the instant litigation, which is premised on CSI's sole assertion of ownership rights. Indeed, IT, ABN, and RBS (which had acquired ABN) executed an indemnification agreement in connection with this litigation. (See Def.'s Opp'n at 28.) Not only that, the record is clear that IT knew about CSI's ownership claim as early as 2001, when the License Agreement was amended (it was then amended again in 2002) – for significant additional consideration paid by IT. (See Kaplan 8/3/12 Decl., Ex. A.) At that point, the License Agreement had been in place for three to five years. There is no evidence in the record that IT asserted that as an author or an owner, it should not have to license, or pay for a license, of BankTrade. (See id., Ex. A.) Had IT believed that it owned some or all of BankTrade, one would not expect a one-way license agreement such as that here, but something akin to a cross-license, or other commercial arrangement. Instead, IT continued to act in all ways as if CSI was the sole owner of the Work. See Netzer, 963 F.Supp. at 1315 ("An express assertion of sole authorship or ownership will start the copyright statute of limitations running") (citing Zuill v. Shanahan, 80 F.3d 1366, 1370 (9th Cir. 1996)); Barksdale, 211 F.R.D. at 244 (same).[25]

Similarly, in 2005, IT and CSI engaged in correspondence regarding IT's desire to terminate a maintenance agreement associated with BankTrade – but expressed a clear intent to maintain intact the 1997 License Agreement. (See Janay Decl., Ex. A.) This correspondence leaves no doubt that CSI was continuing

---

[25] To the extent ABN asserts it had its own author or ownership rights, its ability to assert such rights similarly ran from the dates discussed with respect to IT.

to claim sole ownership and sole ability to control the licensing process, and that IT acted consistent with such a view. Thus, more than three years before CSI even received the copyright registration for BankTrade 8.0, IT was on notice that CSI asserted sole ownership.

In addition, however, the host of documents to which this Court pointed in its decision on summary judgment relating to the assignment issue (see 6/21/13 Order), and reiterated above, further confirm that neither IT nor ABN ever considered IT or ABN to have an actual ownership interest in BankTrade 8.0. (See id. at 6-11.) It would be strange indeed to have a series of internal and external communications regarding where the License Agreement resides, that there is a desire to transfer the License Agreement, and the expected difficulties with that, if in fact those same entities believed that they actually owned the rights at issue. Had anyone held such a belief, documents reflective of this would have been proffered. There are no such documents in the record.

b. An Assertion of IT's Ownership Rights Is, At This Point, Untimely

ABN seeks to salvage its claim that this Court can and should make a determination as to the extent of an ownership interest IT has in the Work by asserting that statutes of limitations do not generally apply to affirmative defenses in the same manner as they do to claims. (See Def.'s 9/20/13 Ltr. at 2-5, ECF No. 305.)

To begin, the Court notes the steps implicitly required by ABN's argument: (1) this Court would first need to consider the evidence and make a determination

regarding <u>ownership</u> rights that have never been asserted by IT and that have never been established (noting that IT is not a party to this lawsuit); and (2) assuming that the Court makes such a determination helpful to ABN, the Court (or a jury) would <u>then</u> have to find that IT had the ability to grant ABN a license, and that it in fact did license ABN to use the Work. This scenario presents a set of factual circumstances unlike those presented by any of the cases cited by ABN.[26]

First, the premise of <u>ABN's</u> argument is that it stands in the shoes of IT and can assert that which IT could assert if IT were the defendant here. That is not so. In all of the cases upon which ABN relies, the competing owners/authors are fending off or pursuing positions with each other. In that specific context, courts have held that one can assert an affirmative defense even though it would not be allowed to do so if it were seeking affirmative relief. Put another way, if IT were the defendant to this infringement case, it may very well be able to assert that it cannot infringe that which it owns. That affirmative defense may or may not prevail, but it would be allowed.

Here, however, the parties to this suit are not so situated. In order for ABN to establish that it could have gotten any type of license from IT, it needs first to establish that IT had or has a sufficient ownership interest to make such a grant; unless IT has a proven <u>ownership</u> right, it has no ability to license the Work. ABN would like to skip or have this Court assume the answer to the first question of ownership, and move on to the second: whether it received, in fact, a license (or,

---

[26] Notably, of course, apart from everything else, there are no facts or documents evidencing any <u>license</u> from IT to ABN.

"authorization"). Here, too, its logic fails. ABN is "assuming away" the ownership question and jumping into subsequent questions that the First Circuit rejected in Cambridge Literary Properties, 510 F.3d at 88.

ABN relies most heavily for this argument in this regard on Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 163 (2d Cir. 2003), which was based on precisely the factual situation not present here; and the cases which cite that case (and which are cited in ABN's letter) are based on similarly inapposite facts. In Estate of Burne Hogarth, the Second Circuit affirmed the district court's determination that a work was properly identified as a work for hire. The parties to that lawsuit were on competing sides of that question – the children of Edgar Rice Burroughs arguing that the work was not made for hire, and "Edgar Rice Burroughs, Inc." arguing the opposite. The debate came to a peak over the course of the immediately preceding years, when competing renewal registrations were sought from the Copyright Office. Id. at 154.

In making a determination as to whose renewal registration took precedence, the Court examined whether the work was made for hire. That issue had been raised as a defense against an assertion of ownership. The Court found that the three year statute of limitations was therefore inapplicable. Id. at 163-64.[27]

However, to properly analogize Estate of Bourne Hogarth to this case, CSI needed to have sued IT, and IT needed to have asserted as a defense that it was the

---

[27] Notably, the Court found that in any event, three years had not in fact elapsed from the time that facts were known to the defendant. Estate of Burne Hogarth, 342 F.3d at 165.

author/owner of at least some of the Work. Or, perhaps, even in an action between ABN and CSI, had IT made a timely claim of an interest and obtained an affirmative ruling, then ABN might be able to assert as a defense to a claim of infringement that IT not only had the ability but did, in fact, license it. (Of course, there are no facts in any event supportive of a license.)

Put simply, to allow an affirmative defense to be put forth despite a statute of limitations having run is one thing; to expand the period within which a claimant may prove its ownership rights outright is an entirely different matter. Since in this case ABN seeks the latter, the statute of limitations applies and provides yet another reason that ABN cannot make out its affirmative defense of joint-ownership over the Work.

The other cases cited by ABN for the same proposition are similarly distinguishable. In <u>Pritchett v. Pound</u>, 473 F.3d 217, 220 (5th Cir. 2006), the copyright registrant asserted its ownership rights as a defense to a claim by an estate that it was entitled to royalties. There, the steps to establish ownership had been taken; the issue was a matter of fending off a claim seeking to undermine those rights.

In <u>Scorpio Music v. Willis</u>, No. 11 Civ. 1557, 2013 WL 790940 (S.D.Ca. Mar. 4, 2013), in the context of the termination of a grant of copyright interest, Willis claimed that he was entitled to a higher percentage of his rights than the percent to which plaintiff agreed. Willis's percentage interest in the work depended upon a subsidiary determination as to whether a third party was also an author because

the third party's rights would dilute Willis's. The question before the court was when Willis's claim as to the third-party's rights accrued. Id. at *2. The court found that Willis's claim had accrued when there was notice to him that his rights were not what he had believed them to be. Id. The Court specifically stated, "rights are not fixed, tangible objects but, rather, are privileges or claims that depend on the interpretation of laws and the rights of others. . . . [T]he Court concludes that when co-ownership or sole ownership claims are raised in the context of a termination of grants, § 507(b) operates as it normally does – e.g. it bars claims brought more than three years after plain and express repudiation of the ownership claim." Id. at *3.

In a dicta footnote in Scorpio, the court also stated that Willis might be able to assert his claim to a larger percentage of ownership as a defense to plaintiff's action for declaratory judgment. (Id. at *6, n.5.) But in that situation, the action was between the two entities that were directly asserting one as against the other the rights that each had. As stated, that is not the case before this Court.[28]

---

[28] The facts of Reach Music Pub., Inc. v. Warner/Chappell Music, Inc., No. 09 Civ. 5580, 2009 WL 3496115 (S.D.N.Y. Oct. 23, 2009), are similar: the action concerned claims of co-owners and authors regarding an accounting (not a third party's assertion of another's rights); see also Martal Cosmetics, Ltd., v. International Beauty Exch., No. 01 Civ. 7595, 2007 WL 2126091 (E.D.N.Y. July 24, 2007) (same; a defendant to a trademark infringement claim seeking to use fraud on the Patent & Trademark Office as a defense to a claim of infringement – not as here, seeking a determination as to a third party's ownership status).

c.  ABN Lacks Standing to Assert IT's Ownership Rights

Even if it were the case that IT had some cognizable ownership rights in

BankTrade 8.0 and that asserting such rights was not untimely, ABN's claim

nevertheless must fail because ABN lacks standing to enforce IT's rights or to use

them as a defense in this matter.

The law is clear that a party accused of infringement cannot defeat that claim

by pointing to rights that another may have to the work in question.  See, e.g.,

Metropolitan Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc., 722 F.3d

591, 600-01 (4th Cir. 2013); Imperial Residential Design, Inc. v. Palms Dev. Grp.,

Inc., 70 F.3d 96, 99 (11th Cir. 1995); Fleming v. Miles, 181 F.Supp.2d 1143, 1158 (D.

Or. 2001) (referring to language in a Ninth Circuit decision that found that a third

party lacks standing to assert another's rights to a copyright to defeat a claim of

infringement: "the defendant had no right to infringe the copyright, regardless of

whether it was owned by A or B"); U.S. v. New Palace Rest., Inc., 810 F. Supp. 440,

442 (E.D.N.Y. 1992) (noting in the context of a civil forfeiture proceeding, "[s]ince

the shareholder claimants are neither owners nor lienholders with respect to

corporate assets, they have no standing in this forfeiture proceeding").

In Cambridge Literary Properties, the First Circuit dealt with an issue

analogous to that before this Court.  It stated:

> Cambridge did not seek an adjudication of its ownership
> rights before seeking whatever remedy it may have if it
> has any ownership rights. . . .  Rather, the complaint
> attempts to evade the issue of whether Cambridge has
> any ownership rights by simply asserting that Cambridge
> is a co-owner and then alleging that Cambridge, as a co-

> owner is entitled under state law to an accounting and
> equitable trust. . . . The accounting and equitable trust
> claims created by state law are premature . . . they are
> not ripe and necessarily rest upon plaintiff having met
> the antecedent showing that it has ownership rights
> under the Copyright Act. Plaintiff may not assert the
> state-law claims for accounting or equitable trust without
> establishing that it is a co-owner.

Cambridge Literary Props. Ltd., 510 F.3d at 80-81. In this case, in order for ABN to

take refuge in the ownership rights of IT, IT must first have established what its

ownership rights are (if any). IT has not done this, and it is now too late to do so.

Cf. Board of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.,

583 F.3d 832, 847 (Fed. Cir. 2009) (finding that the claim of co-ownership

successfully defeated the damages claim because the statute of limitations on such

an assertion had run; defendant itself was sued for infringement – the equivalent

here to IT being the defendant).[29]

   Here, the principles articulated in Cambridge Literary Properties lead to the

following analysis: in order for ABN to successfully assert IT's rights in ownership

as an affirmative defense (and therefore assert that IT could or can retroactively

authorize ABN's ongoing use of the Work), depends on a preliminary finding that IT

has ownership rights. The time to seek such a finding has long passed. That

renders any defense based on IT's ownership wholly ineffective.

   ABN argues that there is ample case law supporting its claim of standing.

(Def.'s 9/20/13 Ltr. at 6-9.) In fact, the cases cited are inapposite. In each one, the

---

[29] Notably, in this case, the claim was found to have accrued at the time that the
copyright claimant offered to license the work that contained another's contribution;
the statute of limitations began to run long before the patent itself issued.

issue is whether an alleged infringer can <u>undermine</u> the plaintiff's ownership by asserting work for hire; the issue is not whether an alleged infringer can establish some ownership rights never asserted by a third party which the third party allegedly shares with the plaintiff. <u>See, e.g., Psihoyos v. Pearson Educ., Inc.</u>, 855 F.Supp.2d 103, 117, n.7 (S.D.N.Y. 2012); <u>M.G.B. Homes, Inc. v. Ameron Homes, Inc.</u>, 903 F.2d 1486 (11th Cir. 1990) (alleged infringer asserted that plaintiff was not a valid copyright owner under the work for hire doctrine); <u>Molinelli-Freytes v. University of Puerto Rico</u>, 09 Civ. 1655, 2012 WL 4665638 (D. P.R. Feb. 15, 2012) (defendant sought to undermine plaintiff's ownership pursuant to the work for hire doctrine as a defense in an infringement suit); <u>International Code Council, Inc. v. National Fire Prot. Assoc., Inc.</u>, 79 U.S.P.Q.2d 1651 (N.D. Ill. 2006) (defendant sought to defeat an infringement claim by asserting that plaintiff did not own the works pursuant to a work for hire theory; the court also noted the policy concern with allowing such a challenge but cited <u>M.G.B. Homes</u> as precedent); <u>In re Napster, Inc. Copyright Litig.</u>, 191 F.Supp.2d 1087 (N.D. Ca. 2002) (defendant in a copyright infringement suit contested ownership by the plaintiffs on a work for hire theory).

 In none of the cases cited by ABN was the defendant <u>conceding</u> the ownership right of the plaintiff, but seeking to establish a third party's right to exist alongside those, in order to then assert that the third party could authorize the defendant's use of the copyrighted work. Moreover, none of the cases cited by ABN are controlling precedent; only one is a case from this district, and it notes that courts

in this district have not dealt with this issue extensively. See Psihoyos v. Pearson Educ., Inc., 855 F.Supp.2d at 117, n.7 (S.D.N.Y. 2012) (citing International Code Council, Inc. for its statement that there "may be some doubt, as a policy matter, about the wisdom of permitting a non-author to challenge the copyright holder's right to enforce its copyright"). The court in Psihoyos also noted that appellate courts have cautioned that a "'district court should give careful consideration where, as here, the work for hire doctrine is invoked solely as a third party defense . . . ." Id. at 117, n.7 (quoting Law Enforcement Training & Research Assocs. v. City & Cnty. of San Francisco, Nos. 90 15482, 90 15638, 1991 WL 172416, at *1 (9th Cir. Sept. 4, 1991) (other citations omitted)).

ABN argues that the case Dataworks, LLC v. Commlog, LLC, 09 Civ. 00528, 2011 WL 2714087 (D. Co. July 13, 2011), is particularly apposite to the situation here. This Court disagrees. In Dataworks, the defendant (Commlog) proffered specific facts regarding an actual license it had received from a third party (BEP) to use a particular work over which plaintiff claimed to be sole owner. Id. at *3. The court noted: "The law is not settled regarding whether a third-party non-author such as Commlog can challenge the validity of an alleged owner's copyright." Id. There, however, the Court noted that the plaintiff (Dataworks) and the third party (BEP) had never entered into a contract that included a provision as to who owned the logs at issue. Id. at *3. Moreover, a specific license was in place between defendant and a third party.

In this case, as set forth at length above, there are specific contractual provisions that deal with precisely with CSI's ownership of the work; over time, both ABN and IT acted in all ways as if CSI was the sole owner; and no actual license agreement between IT And ABN in which IT purported to be acting as an owner exists. The case is not on point.

II. ABN's Assertion that either CSI or IT Granted an Express or Implied License to ABN

ABN also asserts two theories of express or implied license. First, it argues that it has – through CSI – an express or implied license to use BankTrade 8.0. (See Def.'s Mem. at 1, 5-10.) ABN has since changed that argument to asserting that it received an implied license from IT. (See Def.'s 9/20/13 Ltr. at 1.) Neither theory has merit.

ABN bears the burden of proving the existence of an implied license. Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995), cert. denied, 517 U.S. 1240 (1996). The Second Circuit has held that courts should imply licenses only in narrow circumstances. SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc., 211 F.3d 21, 25 (2d Cir. 2000), cert. denied, 531 U.S. 872 (2000) (citations omitted).

As a matter of law, an express license is a contract – there must be a meeting of the minds. SHL Imaging, Inc. v. Artisan House, Inc., 117 F. Supp. 2d 301, 317 (S.D.N.Y. 2000) (citations omitted). An implied license is also a type of contract, albeit implied under the facts and circumstances. See Ulloa v. Universal Music & Video Distrib. Corp., 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004); SimplexGrinnell LP

(Id., Ex. A § 5.)  The License Agreement further provides that CSI's interest in the

licensed Work remains even upon the expiration or termination of the License

Agreement:

> The System and all documentation, and all copies thereof,
> are proprietary to Complex.  All applicable rights to
> patents, copyrights, trademarks and trade secrets in the
> System or any modification made at Licensee's request
> are and shall remain in Complex. . . .  This Section 9 will
> survive the expiration or termination of this Agreement.

(Id. at § 9.)[30]

No license between ABN and CSI exists; there is therefore no valid claim for

an express license grant from CSI to ABN.

Similarly, ABN's argument that it received an implied license from CSI is

unavailing.  The facts recited above make it clear that following the sale of IT, ABN,

IT, and CSI all communicated about the fact that the 1997 License Agreement was

between IT and CSI and that it continued to reside with IT post-sale.  Following the

sale, the evidence shows that ABN was actively seeking an answer to this dilemma

– not asserting it already had the rights it needed.  There are no circumstances on

which to base any claim that ABN and CSI had any meeting of the minds as to the

existence of a license.

---

[30] The License Agreement also provides: "This Agreement, as amended, and any of
the licenses, programs, or materials to which it applies may be assigned among the
above mentioned entities of the Licensee [which is IT] without the consent of
Complex.  The parties further agree that the transfer of control of the Licensee to an
affiliate or parent entity shall not require the consent of Complex."  (Kaplan 8/3/12
Decl., Ex. A § 20 (emphasis added).)  This provision provides IT with the right to
transfer its license to its own entities – following the LaSalle transaction, ABN was
not an entity of IT's.

43

### b. IT Did Not Grant ABN an Express or Implied License

ABN's final redoubt is its argument that somehow it obtained an express or implied license from IT. There are no facts supporting that IT had the ability to license ABN – or that having such an ability, it did.

The starting and ending point for all of IT's rights with respect to BankTrade is the 1997 License Agreement. That Agreement does not provide IT with any rights to "license" the Work to third parties. (See, e.g., Kaplan 8/3/12 Decl., Ex. A ¶¶ 1, 2.) It is certainly the case that IT had and continues to have the ability to utilize BankTrade 8.0 in any of its affiliated companies; IT even had the right to assign the 1997 License Agreement to certain affiliated companies. It has no right, however, to assign the License Agreement to non-affiliated companies (see e.g., id. ¶ 20), which ABN indisputably is following the sale of IT in 2007.

This Court has already found that there is no factual basis to assert that an actual assignment of the License Agreement occurred before IT and ABN parted ways. (See 6/21/13 Order.) Indeed, there is significant conduct following the sale of IT to demonstrate that neither party believed that a pre-closing assignment had occurred – though ABN wishes it were otherwise. Lacking any right to make a post-closing assignment, IT provides no assistance to ABN in its quest for a license.


### CONCLUSION

For the reasons set forth above, CSI's motion for summary judgment is GRANTED. However, there remain unresolved issues regarding willfulness and

the quantum of damages. Since ABN has always conceded its continued use of BankTrade, willfulness might, in this instance, be amenable to resolution on summary judgment. Similarly, the quantum of damages may or may not be subject to factual dispute. Accordingly, the parties shall submit letters to the Court **not later than October 28, 2013** setting forth their position as to whether on these facts, one or both issues are amenable to resolution on summary judgment.

Additionally, as the posture of this case has changed, the Court terminates the pending motions-in-limine at ECF Nos. 195, 218, 227, 231, and 251, with leave to renew as appropriate.

The Clerk of Court is directed to terminate all open motions in this action (specifically, ECF Nos. 195, 202, 218, 227, 231, and 251).

Dated:      New York, New York
            October 17, 2013

                                        KATHERINE B. FORREST
                                        United States District Judge