UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
COMPLEX SYSTEMS, INC.,                                       :
                                           Plaintiff,        :
                                                             :
                    -v-                                      :
                                                             :
ABN AMBRO BANK N.V.,                                         :
                                           Defendant.        :
                                                             :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: NOV 0 8 2013

08 Civ. 7497 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On October 25, 2013, the Court granted summary judgment on the issue of

liability in favor of plaintiff Complex System, Inc. ("CSI") as against defendant ABN

AMRO Bank N.V. ("ABN") in this copyright infringement action.[1]  Currently

pending before this Court is a motion in limine filed by ABN that, among other

things, seeks to preclude evidence of indirect profits.[2]

---

[1] As the Court's October 25, 2013 Opinion & Order explains in detail, this is the
second grant of summary judgment in CSI's favor. (See 10/25/13 Order.)  Prior to
the October 25, 2013 decision, the Court granted summary judgment to CSI on
ABN's primary defense:  that ABN's former subsidiary and CSI's licensee (IT) had
assigned its license to ABN prior to ABN's sale of ABN AMRO IT ("IT") to LaSalle
Bank on April 22, 2007.  (See 6/21/13 Order.)

[2] ABN's motion in limine also raises the following issues not currently before the
Court: (1) limiting CSI's actual damages to the fair market value of a renewed
BankTrade license; and (2) recovery of direct profits by CSI under Section 504(b) of
the Copyright Act. (See Def.'s Mem., dated Nov. 1, 2011, ECF No. 328.)  These
unrelated arguments concern an initial filing of ABN's motion in limine on May 17,
2013. (See ECF No. 218.)  Due to the ongoing proceedings relating to narrowing
and disposing of liability issues, the Court terminated all pending motions in this
action, with leave to renew such motions if and when they became relevant. (See
10/25/13 Order.)  Following the Court's Opinion & Order granting summary
judgment, ABN raised the issue of indirect profits (see ECF No. 321), and the Court
directed the parties to re-file their papers as to that issue. (See ECF No. 325.)

The underlying infringement action relates to a copyrighted software application, BankTrade 8.0 ("BankTrade"), used to facilitate certain banking transactions.  BankTrade is utilized by ABN in its letter of credit and guarantee business.  (See Def.'s Mem. at 6.)

A former ABN subsidiary, IT, licensed the BankTrade software from CSI. (See 10/25/13 Order at 5-15.)  On April 22, 2007, an ABN subsidiary, IT, was sold to Bank of America (the "LaSalle transaction").  (See id. at 16-18.)  Following that sale, ABN continued to use the software – without an assignment and without a license. (See 6/21/13 Order; 10/25/13 Order; Pl.'s Mem. at 3, dated Nov. 1, 2013, ECF No. 333.)  ABN has continued to use BankTrade to the present.  (Jarosz Decl., Ex. 1 at 9.)

Having resolved liability, two issues remain to be tried:  the quantum of damages and willfulness.  (See 10/25/13 Order at 44-45.)  ABN now seeks to preclude CSI from introducing evidence of indirect profits.  (See Def.'s Mot., dated Nov. 1, 2013, ECF No. 327.)

For the reasons set forth below, ABN's motion in limine is GRANTED.  Based on the record currently before this Court, evidence of indirect damages shall be precluded at trial; plaintiffs have failed to establish a sufficient causal nexus between the infringement and ABN's revenues.

## LEGAL BACKGROUND

### I.    Motions in Limine

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." Palmieri v. Defaria, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks and citation omitted); accord Highland Capital Mgmt., L.P., v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008).  Rule 104 of the Federal Rules of Evidence requires that a court make a preliminary determination of the admissibility of all evidence. Fed. R. Evid. 104.  "The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." U.S. v. Ozsusamlar, 428 F. Supp. 2d 161, 164-65 (S.D.N.Y. 2006) (citations omitted).

A motion in limine is a proper conduit to determine the admissibility of evidence regarding whether certain types of damages will go to a jury. See International Bus. Machs. Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2013 WL 1775437, at *3 n.5 (citing In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 517 F. Supp. 2d 662, 667 (S.D.N.Y. 2007)); see also, e.g., Faulkner v. National Geographic Soc'y, 576 F. Supp. 2d 609, 612-13 (S.D.N.Y. 2008).

### II.    Damages Pursuant to the Copyright Act

Section 504 of the Copyright Act of 1976 ("the Copyright Act") provides that an infringer of a copyright is liable for actual damages and any additional profits of

3

the infringer.[3]  See 17 U.S.C.A. § 504(a).  Section 504(b) specifically provides for

"Actual Damages and Profits:"

> The copyright owner is entitled to recover the actual
> damages suffered by him or her as a result of the
> infringement, and any profits of the infringer that are
> attributable to the infringement and are not taken into
> account in computing the actual damages.  In establishing
> the infringer's profits, the copyright owner is required to
> present proof only of the infringer's gross revenue, and
> the infringer is required to prove his or her deductible
> expenses and the elements of profit attributable to factors
> other than the copyrighted work.

17 U.S.C.A. § 504(b).

The term "gross revenue" must be construed as "gross revenue reasonably

related to the infringement, not unrelated revenues."  On Davis v. The Gap, Inc.,

246 F.3d 152, 160 (2d Cir. 2001).  Gross revenue should not be construed so broadly

as to include revenue from lines of business unrelated to the act of infringement.

Id. (analogizing to a publisher and explaining that "if a publisher published an

anthology of poetry which contained a poem covered by the plaintiff's copyright," it

would not be proper to use for the determination of damages "gross revenue

resulting from its publication of hundreds of titles, including trade books, textbooks,

cookbooks, etc." – instead, "the owner's burden would require evidence of the

revenues realized from the sale of the anthology containing the infringing poem").

Depending on the degree of attenuation, an infringer's profits may be "direct"

or "indirect."  See, e.g., Mackie v. Rieser, 296 F.3d 909, 914 (9th Cir. 2002); Frank

---

[3] Rule 504 also provides for the possibility of statutory damages, which are not here
at issue.  See 17 U.S.C.A. § 504(c).

Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 517 (9th Cir. 1985).  Both types are legally cognizable if the copyright owner can provide sufficient proof of a causal nexus between the infringement and the profit as to which the copyright owner is seeking disgorgement.  See Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 711 (9th Cir. 2004) (explaining that Section 504(b) "creates a two-step framework for recovery of indirect profits:  (1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and (2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement"); Andreas v. Volkswagen of Am., Inc., 336 F.3d 789, 796 (8th Cir. 2003); Mager v. Brand New Sch., No. 03 Civ. 8552, 2004 WL 2413978, at *3-4 (S.D.N.Y. 2004) (citations omitted).

Damages only remotely or speculatively attributable to the infringement should be precluded.  See Business Trends Analysts, Inc. v. Freedonia Grp., Inc., 887 F.3d 399, 404 (2d Cir. 1989); Mackie, 296 F. 3d at 914-15; International Bus. Machs. Corp., 2013 WL 1775437, at *3-4 (citations omitted); DaimlerChrysler Servs. v. Summit Nat'l, No. 02 Civ. 71871, 2006 WL 208787, at *3-4 (E.D. Mich. 2006) (citations omitted).

The requirement of a "causal" nexus – versus some non-causal "connection" – is rooted in the text of the statue itself:  "The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement . . . ."  17 U.S.C.A. § 504(b) (emphasis added); see also Polar Bear Prods. Inc., 384 F.3d at 713 (stating that the "causal nexus between the infringement and the profits sought" is

5

a "run-of-the-mill" requirement).  Further, in On Davis v. The Gap, Inc., the Second Circuit required that sought-after revenues have a "reasonable relationship to the act of alleged infringement." 246 F.3d at 160; see also Granger v. Gill Abstract Corp., 566 F. Supp. 2d 323 (S.D.N.Y. 2008); Mager, 2004 WL 2413978, at *4. "Such an approach dovetails with common sense – there must first be a demonstration that the infringing act had an effect on profits before the parties can wrangle about apportionment." Mackie, 296 F.3d at 915 (emphasis added).  Further, "'[b]ecause of the at-best highly speculative nature of all indirect profits claims' . . . the decision to 'send[ ] such claims to a jury should be extremely rare.'" International Bus. Machs. Corp., 2013 WL 1775437, at *3 (alteration in original) (citing 6 William F. Patry, Patry on Copyright § 22:131 (2010)).

A copyright owner bears the initial burden of demonstrating a causal nexus between the infringement and the appropriate gross revenues. See Mager, 2004 WL 2413978, at *4; Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 751 (D. Md. 2003) (citations omitted).  Once a copyright owner has demonstrated a sufficient causal nexus between the infringement and the appropriate gross revenues, the burden shifts to the infringer "to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work." On Davis, 246 F.3d at 160.

Several cases illustrate the burdens borne by the copyright owner in this context.  For example, in Mackie v. Reiser, the infringer used a copyrighted artwork in a brochure aimed at promoting subscriptions to the Seattle Symphony Orchestra.

296 F.3d at 912. Plaintiff sought indirect profits comprised of profits the Symphony generated the season plaintiff's artwork was used, as well as profits for future seasons, "arguing that many patrons who subscribed to the [season at issue] because of the infringing collage later renewed their subscriptions." Id. at 912-13. The district court granted defendant's motion for partial summary judgment on the issue of indirect damages, holding that plaintiff's evidence regarding indirect profits was, as a matter of law, too speculative to support disgorgement. Id. at 913-14. The Ninth Circuit affirmed, reasoning that it could "surmise virtually endless permutations to account for an individual's decision to subscribe to the [series at issue], reasons that have nothing to do with the artwork in question." Id. at 916.

In International Business Machines Corp. v. BGC Partners, Inc. ("BGC Partners"), IBM claimed that BGC had infringed its copyrighted software application, Informix. 2013 WL 1775437, at *1-2. BGC, an intermediary between financial institutions, "uses software, including Informix, for its [ ] back-office functions, such as administratively processing trades after their execution and generating various reports and invoices." Id. at *3. IBM sought to recover all of BGC's profits as indirect profits based on "BGC's representation that Informix was integrally important to the operations of BGC and its ability to service its customers." Id. at *3-4 (emphasis added) (internal quotation marks omitted).

The court found that IBM's indirect profits argument was "overly speculative," reasoning that while BGC acknowledged that an "immediate disruption and cessation" of Informix would have a "devastating effect," BGC

7

"consistently maintained that migration to another software system . . . would have little to no effect." Id. at *3 (internal quotation marks omitted). The court found that IBM's claim went beyond that which was reasonably derived from the infringement itself; IBM failed to proffer sufficient evidence of a causal link between the infringement and revenues. Id. at *4 (emphasis added). The court explained that "BGC did not market or sell the Informix software to its customers and there is no evidence that its customers cared what software system it used." Id. (stating that "[w]hile BGC may have profited from using Informix indirectly in that it enabled BGC to operate more efficiently," this basis for recovery was nonetheless too speculative) (citations omitted).

In BGC Partners, the court also noted the similarities between that case and a prior Eastern District of Michigan case, DaimlerChrysler Services. v. Summit National. 2006 WL 208787, at *2-3. In DaimlerChrysler, the copyright owner also sought disgorgement of all of the infringer's profits based on statements that the back-office software at issue was "an essential component of a larger profit generating process." Id. at * 2-3. DaimlerChrylser had admitted that the software was critical to its business and that without it (or an acceptable replacement), it would have shut down. Id. at *1.

The Eastern District of Michigan reiterated the proposition that before evidence of indirect profits are allowed in, a court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and indirect profits. Id. at *3 (citing Lowry's Reports, Inc., 217 F. Supp. 2d at 3). The

court explained that where profits can be traced to a complex income stream – in which the infringing work may fit – courts have required the copyright owner to "introduce detailed evidence linking gross revenues to the infringement." Id. at *4 (quotation marks and citation omitted).  As the court explained:

> [DaimlerChrysler argues] . . . that although it could not likely have carried on business without [the infringing work] (or some suitable substitute), it does not follow that every cent of profit [DaimlerChrysler] generated was attributable to [the infringing work].  Its analogy is helpful in this respect:  [DaimlerChrysler] could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes.

Id. at *3.

In Lowry's Reports, Inc. v. Legg Mason, Inc., the owner of a copyrighted stock market newsletter sought damages for defendant broker's employees' use of those newsletters. 271 F. Supp. 2d at 751.  The court stated that even if the newsletters played an "important" or "significant" role in the employees' decision-making, any correlation between the reliance and defendant's profits was speculative.  Id. at 752. The court explained: "The complex, variable, independent thought processes of hundreds of individual brokers intervene between the copying and any subsequent gain." Id.[4]

---

[4] In addition to On Davis v. The Gap, Inc. (see supra), other courts in this district have denied indirect damages on the basis that the copyright holder failed to prove causation and instead had only speculative claims.  See Mager, 2004 WL 2413978; Granger v. Gill Abstract Corp., 566 F. Supp. 2d 323 (S.D.N.Y. 2008).  In Burns v. Imagine Films Enter., Inc., the court allowed discovery on the issue of indirect damages where an amusement park attraction was based directly on an infringing work and would not exist "but for" infringement of the copyright owner's screenplays.  164 F.R.D. 589, 592 (W.D.N.Y. 1996).

In some of these cases (e.g., <u>BGC Partners</u> and <u>DaimlerChrysler</u>), the copyright owner – unlike CSI here, as discussed below – sought disgorgement of all profits of the infringer.  That, however, was not the only basis on which the courts rejected the indirect profits claim.  A key issue was whether the copyright holders showed a causal tie between the profits and infringement.  <u>See</u> <u>International Bus.</u> <u>Machs. Corp.</u>, 2013 WL 1775437, at *4; <u>DaimlerChrysler Servs.</u>, 2006 WL 208787, at *4.  The missing link was that the profits the copyright owner sought to disgorge were <u>caused</u> – or "attributable" – to the infringement.  In these cases, while a connection between use of the infringer's product and the revenues obtained was shown, mere connection or usage alone was insufficient – each case confirmed the general underlying proposition that a copyright owner must meet the statutory requirement of showing <u>attribution</u>.

## FACTUAL BACKGROUND

It is undisputed that ABN has used and continues to use BankTrade in connection with its trade finance business.  In support of its claim for indirect profits, CSI has submitted three reports by John C. Jarosz[5] and three reports by Donald R. Smith.[6]  Taken together, these reports attempt to explain the causal

---

[5] The Court notes that ABN filed a motion in limine to preclude certain testimony by Jarosz on May 24, 2013.  (<u>See</u> ECF No. 231.)  Resolution of that motion (which has not yet been formally renewed) is not necessary to the result herein.
[6] These documents are not available on the public docket because they are filed under seal.

nexus between BankTrade and certain revenue streams from which CSI seeks disgorgement of ABN profits.[7]

BankTrade "is a component-based solution designed to provide end-to-end automation of the full range of trade finance processing, and to streamline trade processing and other trade finance activities." (Jarosz Decl., Ex. 1 at 7.) BankTrade is one of four trade processing systems used by ABN to process letters of credit and guarantees; BankTrade is not used to process foreign exchange spreads, treasuring funding, loans, lines of credit, or overdrafts. (Def.'s Mem. at 5, 18.)

Jarosz states that his work has focused on a determination "of the revenues and profits that have been attributable to the defendant's infringement of the BankTrade copyright." (Jarosz Decl. ¶ 4.) He examined the period from January 2008 through June 2011, which was the period for which he had quarterly data available. (Id. ¶ 5.) Jarosz's findings indicate the following:

> The revenue that can be attributed to the use of BankTrade is approximately 0.6 percent (i.e. less than one percent) of defendant's total revenue for this period. This is before apportionment of the revenue to account for resources other than BankTrade that are used in processing the transactions through BankTrade. After apportionment, the revenue (not profit) number is approximately 0.2 percent of defendant's revenues for that period.

(Id. ¶ 6.) Based on Jarosz's work, and the revisions that he made following the submission of ABN's reports, various amounts are attributable to the infringement

---

[7] ABN has submitted declarations from Dermot Canavan and Richard W. George. Also discussed in the parties' papers is the expert report of Christine M. Hammer. These reports criticize the causal nexus CSI asserts generally and as to particular revenue streams. They also set forth ABN's view on appropriate deductions.

in the following areas: (1) "core trade finance," which is defined by Jarosz as "the facilitation of the reaching of a trade agreement between two parties" (e.g., letters of credit and guarantees); (2) spreads on foreign exchange transactions; (3) treasury funding; (4) interest margin or fees on loans; (5) lines of credit; (6) overdrafts; and (7) insourcing. (Id., Ex. 1 at 1, 10.)

ABN disputes CSI's claim for indirect profits, calling it overly-broad and speculative. ABN explains CSI's position as follows: "(1) without BankTrade, ABN could not process letters of credit, (2) without letters of credit, CSI would not conduct other types of trade finance transactions, and (3) therefore, without BankTrade, ABN would not conduct other types of trade finance transactions." (Def.'s Mem. at 19.) ABN argues that this approach to indirect profits is impermissible. (Id.) ABN also argues that the operative issue is "not whether ABN's letters of credit business has driven sales in other trade finance products," but rather, "whether ABN's use of BankTrade has driven – or caused – sales in those non-BankTrade product lines." (Id. at 19-20 (emphasis in original).) ABN's position reflects a correct interpretation of Section 504(b) and existing case law.

I.    Jarosz Report

Jarosz is not himself an expert in trade finance. He is a trained economist who, among other things, has experience in measuring damages in intellectual property cases. (See Jarosz Decl., Ex. 1 at 2.) The necessary premise of Jarosz's entire report is that a causal nexus in fact exists between BankTrade and the relatively narrow set of revenue streams he then examines. Nothing in Jarosz's

background suggests any practical experience or study of BankTrade's actual role in ABN/RBS's customer relationships, actual sales practices, or actual revenue generation. Accordingly, before Jarosz has a sufficient foundation on which he can rest the revenues he finds touch BankTrade in some way, a <u>causal</u> link between BankTrade and ABN's revenues must be established: profits must be <u>attributable</u> to BankTrade, not just touch the application in some way.

Jarosz cannot himself opine on causation – he lacks the knowledge or expertise in this area. To fill in this gap, Jarosz relies on a May 29, 2007 press release issued by ABN, a trade analyst's report, and newspaper articles. (Jarosz Decl., Ex. 1 at 5-7.) As set forth below, and as laid out in the <u>Discussion</u> section of this Opinion & Order, none create the required causal link.

The May 2007 press release was issued in connection with RBS's acquisition of ABN; RBS states that it expects to retain the technology platform supporting ABN's cash management and trade finance business:

> ABN AMRO is one of a relatively small number of banks with a strong capability in international cash management, payments[,] and trade finance. These are 'sticky' products, often the foundation of long-term relationships which will provide opportunities . . . to sell higher value products . . . [and] to enhance its customer relationships by offering [ABN's] stronger products and capabilities in cash management and trade finance.

(Jarosz Decl., Ex. 1 at 5.)[8] A research analyst contends that ABN's trade finance platform is "one of the industry's best." (<u>Id.</u> at 6.) One of the news stories on which

---

[8] While not discussed in Jarosz's report, CSI also makes much of a May 2001 "Project Proposal" (<u>see</u> Kaplan Decl., Ex. 1), which proposes using BankTrade in

Jarosz relies states: "One of the jewels in the ABN crown for RBS is the . . . business of cash management and trade finance business.  ABN is one of a handful of banks to offer such a system globally . . . and RBS executives are excited by the prospect of keeping more of their own clients' cash management business and of using the service to sell its own range of treasury products around the globe." (Def.'s Mem. at 6.)  None of these documents (even assuming admissibility for present purposes) demonstrates the required causal nexus.

Nevertheless, Jarosz proceeds to assume causation and examines the appropriate revenue streams to include.  As a logical matter, inclusion of each separate revenue stream requires an independent determination of casual nexus – that has also not been demonstrated.  In determining which revenue streams enjoyed indirect profits from ABN's use of BankTrade, Jarosz examined "core trade finance activities" that use BankTrade – namely, letters of credit, guarantees, and collections.  (Id. at 21.)  Additionally, Jarosz examined "revenues from other activities not directly processed on [BankTrade], but resulting from transactions processed on [BankTrade]."  (Id. at 21 (emphasis added).)[9]  Specifically, Jarosz

---

ABN's back-office.  (See Pl.'s Mem. at 6-8.)  The Project Proposal describes BankTrade as "a critical component" of, among other things, increasing trade revenues.  (See Kaplan Decl., Ex. 1 at 2.)  While CSI relies on this document to support its assertion that BankTrade is, in fact, critical to ABN's success, the document is nothing more than internal marketing – ABN wanted to obtain BankTrade; this document is intended to effectuate that outcome.  It says nothing about whether ABN profits post-acquisition – that is, April of 2007 forward – were actually caused by BankTrade.  (See infra.)

[9] Jarosz states: "For example, an importer that used a letter of credit to facilitate the purchase of goods may need to convert euros in its bank account to yen in order to pay for the goods upon receipt.  While the foreign exchange transaction is

looked at spreads on foreign exchange, treasury funding, interest on loans, and lines of credit. (Id. at 27-39.) Moreover, while acknowledging that little information was available on the revenue earned from overdrafts and insourcing, Jarosz includes these sources of revenue in his analysis for the same reason. (Id. at 39-40.)

To explain why he looked beyond those trade finance transactions actually processed on BankTrade, Jarosz relies on the interconnectedness between "core trade finance" and the revenue generation events that allegedly stem from those initial transactions. (Id. at 10.) For example, Jarosz explains that after a trade transaction has been processed, "buyers and sellers often need financing to facilitate the trade transaction," so "[b]anks generate additional income through use of more traditional financing methods with trade finance customers" (e.g., lines of credit, overdrafts, loans, etc.). (Id. at 12-13.) As a further step down the line, Jarosz cites to the press release language quoted above for the assertion that trade finance products are "sticky" and well-suited for cross-selling, which means that they often lay the foundation for longer-term banking relationships. (Id. at 19 (citation omitted).)[10] Jarosz also states that the "acquisition of ABN expanded RBS's

---

executed by GBM rather than on BankTrade, the revenues GBM captures are the direct result of the transaction processed on the System." (Jarosz Decl., Ex. 1 at 21.)

[10] Jarosz cites to the following RBS statement in support of this assertion: "And, often overlooked in RBS, our wealth business Coutts, and what we call our GTS business, our money, our trade finance, our cash management which is a global business, these are terrific examples, not only of businesses which are strong in their own right, but that really are glue for the Group; that we share synergies, that we share customers, that provide deposits for the rest of the Group in order to make loans to our customers, and that provide a return on equity that's attractive and high and that goes with our other activities." (Jarosz Decl., Ex. 1 at 10 (internal

customer base, particularly in the Asia-Pacific region where RBS did not have a strong corporate presence." (Id. at 19.)

It is plain, therefore, that Jarosz assumes a causal nexus (well beyond some general connection) between core trade finance activities and additional revenue streams.

In his rebuttal report dated April 25, 2012, Jarosz adjusts the revenues he opines are attributable to ABN's infringement of BankTrade. (Jarosz Decl., Ex. 2 at 2-3.) In addition, Jarosz highlights the importance of the BankTrade software, explaining that "RBS would face significant operational hurdles in its trade finance business if it were to immediately 'turn off' BankTrade, and that it would take years and tens of millions of dollars to bring an alternative system online." (Id. at 5.) Jarosz further explains, in the context of "credit fees," that "[w]ithout the processing of a [letter of credit] or a guarantee, there would be no transaction" on which the bank could then derive additional revenue. (Id. at 10.)

As a matter of fact, Jarosz has proffered reasonable estimates of revenues somehow connected to or touching BankTrade. His extensive analysis supports this much. As explained below, what is missing is the necessary causation component.

II.   Smith Report

In contrast to Jarosz, Smith is proffered as a general expert in trade finance. (See generally Kaplan Decl., Ex. 5 ("Smith Report").)  Smith was retained not to

_____

citation omitted).)  Additionally, Jarosz cites to statements by other banks recognizing the value of trade finance to other aspects of their business. (See id. at 20.)

provide an opinion on the damages associated with ABN's infringement of BankTrade, but instead, to provide a tutorial on various aspects of trade finance and both their interrelatedness and connectedness to other areas of the bank. (See id.) Smith's reports and deposition provide significant support for ABN's (and not CSI's) position on this motion: that a causal connection between BankTrade itself and specific trade finance revenues is lacking.

In the course of his career, Smith worked at a financial institution that utilized BankTrade for trade finance (see Kaplan Decl., Ex. 4 ("Smith Dep.") at 14-15), as well as at other institutions that utilized similar such products (see generally id. at 15-50). Indeed, Smith has several decades of experience in trade finance as a former bank employee and as a consultant to banks, importers, and exporters. (Smith Report at 2.) Smith explains that software products (of which BankTrade is only one) have certain generic characteristics:

> The products used by banks to support their clients in the
> domestic trade finance area are usually identical with
> those used internationally because banks typically use the
> same computer software programs for the domestic trade
> finance as they use for international trade finance. These
> computer programs typically link to other computer
> programs in the bank to provide a uniform approach to
> providing clients with the necessary related products to
> complete the trade finance transactions.

(Id. at 5.) Smith states that trade finance brings revenue to banks both via "traditional paper-based transactions used to assist buyers and sellers" and additionally, with various other products that include collections, letters of credit, letters of guarantee, and other "commonly used traditional financing products"

17

including trade loans, letter of credit financing, trust receipts, shipping guarantees, and forfeiting. (<u>Id.</u> at 6-7.) Smith outlines a series of possible revenue streams that can be connected to a letter of credit. (<u>Id.</u> at 9-19.)

In conjunction with this discussion, Smith notes that "[r]evenues associated with [l]etters of [c]redit are complex instruments and staff in this area of the bank are specialists in their field." (<u>Id.</u> at 9.) He also states that "[t]he complex nature of trade finance transactions fosters close relationships between banks and their corporate clients, and with other banks. Therefore trade finance is often used by a bank as a business development tool to obtain new clients or to broaden their relationship with existing clients." (<u>Id.</u> at 19.) Smith concludes by stating that "[t]rade finance is complex and even an apparently simple transaction involves a very large number of bank products, fees[,] and lending based services . . . ." (<u>Id.</u> at 19.) Smith does not opine that trade finance relationships are more likely to start with a letter of credit than some other transaction; he does not opine that banks lacking specific software execution capabilities (let alone BankTrade) are disadvantaged versus other institutions in obtaining a customer's trade finance transactions; he does not opine that the software a bank may use for trade finance is more important than the human "specialists in their field" to which he refers. (<u>Id.</u> at 9.)

III.   <u>Smith Deposition</u>

In his deposition, Smith testified that BankTrade provides core trade finance processing – and that he is aware that other software applications also provide such

processing. (Smith Decl. at 24.) Smith recollected that at least from 2003 to 2009, there were five or six vendors providing such applications. (Id. at 24, 26.) Smith stated that each software application had its own approach to processing and functionality. (Id. at 25.) He agreed, however, that "[t]here is a certain basic set of functionality that appears to apply across those software suppliers that have remained in business." (Id.)

Also during his deposition, Smith discussed a specific experience he had working for a banking institution (First Union) that transitioned to BankTrade. (Id. at 28.) Smith's deposition testimony is the only evidence in the record regarding whether there is a reasonable basis − or any basis − to infer a causal connection between use of BankTrade and the generation of revenue for a bank:

> Q: When BankTrade was implemented at First Union, did the level of foreign exchange transactions increase as a result of BankTrade?
>
> A: I would not say they increased or decreased as a result of having automated the process.

(Id.)

> Q: Would you say that automation of the process had no impact on the level of foreign exchange transactions?
>
> A: I am not aware of any impact on the number of transactions that we did.
>
> . . .
>
> Q: Did it also increase the amount of trade finance loans that were extended by the bank?
>
> A: Not that I am aware of.

Q: Did the implementation of BankTrade change or
impact the amount of collateral that the bank might take
in in connection with letter of credit or other trade finance
transactions?

A: Not that I am aware of. I'd say it had the same impact
there as it did on loans, for example, as interfaces that
allowed us to do one-stop processing.

Q: Did the implementation of BankTrade at First Union
change the amount of overdrafts that the bank did in
connection with trade finance transactions, including
letters of credit?

A: Not that I am aware of.

Q: Did the implementation of BankTrade at First Union
impact the lines of credit that First Union issued?

A: It impacted the manner in which we utilized those
lines of credit through automated interfaces to our credit
management programs.

Q: Did it impact the amount of lines of credit at the bank?

A: Not that I am aware of.

(Id. 28-30.)[11]

Further undercutting a specific software making a <u>causal</u> difference in

revenue generation was Smith's testimony regarding work he has done for Citibank.

(Id. at 37.) Smith explained that Citibank generally developed its own trade finance

software applications or alternatively, purchased packaged products from vendors

and then adapted those systems to meet its unique set of needs. (Id. at 40.) Smith

---

[11] In two instances, with regard to "one-stop processing" and "automated interfaces,"
Smith's testimony is suggestive of some impact of automation (versus manual
processing) having a potential (non-specific) impact. Given the ubiquity of
automation and the prior testimony of similar functionality, this testimony cannot
support a causal nexus to use of BankTrade and particular revenues.

20

avers that Citibank was an impressive entity, explaining that it was "on the ground with branches and offices in . . . a hundred countries at that point in time, and had the ability to do global trade finance business in 70 or 80 of those countries." (Id. at 41.) Smith could not, however, specifically recall the name of the trade finance processing system used by Citibank. (Id. at 40.) He did not recall Citibank marketing its core trade processing system for trade finance transactions by name; rather, Citibank marketed itself as being able to meet its clients' needs. (Id. at 49.)

Smith agreed that his report did not opine on whether BankTrade generated any particular revenues for the bank. (Id. at 101.) He also did not have any opinion as to whether trade processing systems generated any particular revenues at ABN. (Id. at 104.)

Further undercutting Jarosz's work tracing revenues from letters of credit through to other trade finance products, Smith testifies that a bank's customers might use one trade finance product and not another for reasons specific to their needs:

> Q: But it's also true that there are many lines of credit that pre-exist and don't necessarily contemplate use of them in connection with a letter of credit?

> A: That is true, and they may not be available then for use under letters of credit.

(Id. at 161-62.)

> Q: And fundamentally, whether to issue a letter of credit to a particular customer is a credit-based, lending-type risk exposure-type decision?

> . . .

> A: I would say generally speaking. But I'm very careful in saying generally. There are <u>a lot of other things</u> that go into that.
>
> Q: And some of the fees that the bank charges for letters of credit are related to the cost of extending that credit; correct?
>
> A: That is correct.

(<u>Id.</u> at 164-65 (emphasis added).)

> Q: [W]ould you agree that the primary consideration a bank takes into account when extending a letter of credit is whether the bank wants to risk its balance sheet assets, its cash, in connection with extending the letter of credit?
>
> A: Yes.

(<u>Id.</u> at 171.)


## DISCUSSION

As mentioned above, ABN now seeks to preclude CSI from presenting evidence of CSI's claim for indirect profits – i.e., those profits that stem from ABN's use of BankTrade. In its reply letter,[12] ABN argued that CSI cannot recover indirect profits because it failed to establish "a legally sufficient causal link between

---

[12] On November 1, 2013, ABN submitted a letter to the Court explaining that in accordance with the Court's rules, ABN did not submit reply briefs to its motions in limine at the time of their initial filing. (<u>See</u> Def.'s 11/1 Ltr. ("Def.'s Reply"), dated Nov. 1, 2013, ECF No. 330.) It requested that the Court consider certain pages contained in a letter it filed on October 28, 2013, which discussed some of the issues raised by CSI's opposition, in connection with the motion currently before the Court. The Court granted ABN's request. (<u>See</u> ECF No. 337.)

ABN's use of BankTrade and ABN's profits from its trade finance business." (See Def.'s Reply at 3.)

In opposition, CSI argues that it has not sought profits beyond those that can be clearly traced back to ABN's use of BankTrade. CSI states that its experts identified revenue stemming "only from transactions processed through BankTrade" and then "adjusted that downward by apportioning it to account for the fact that, to generate this revenue, ABN also needed to use resources other than BankTrade," including personnel, other software, infrastructure, and the like. (See Pl.'s Mem. at 10 (emphasis in original).)[13] Use is, of course, not necessarily evidence of causation.[14]

The profits associated with ABN's use of BankTrade are necessarily indirect: they are based on assumptions regarding the use of BankTrade to lead to a transaction, which may lead to subsequent transactions (and subsequent profits) for ABN (and RBS). As set forth above, in order to make out such a claim for indirect profits, CSI bears the burden of showing a causal connection between ABN's use of BankTrade and the profits sought. See 17 U.S.C.A. § 504(b) (allowing a copyright owner to recover profits from the infringer that are "attributable to the

---

[13] CSI too submitted a letter in reply, which the Court has taken into account in deciding this motion. (See Pl.'s 11/1 Ltr. ("Pl.'s Reply"), dated Nov. 1, 2013, ECF No. 338.) In its reply letter, CSI brings two additional court cases not cited elsewhere to the attention of the Court. The Court has reviewed these cases.

[14] In On Davis, the Second Circuit noted the legal potential for a damages theory based on use. See On Davis, 246 F.3d at 159-61. As stated there and in the case to which On Davis refers for this proposition, Business Trends Analysts, Inc., 887 F.2d 399 (2d Cir. 1989), a causal connection is required. 887 F.3d at 404.

infringement"); Polar Bear Prods., Inc., 384 F.3d at 713; Mackie, 296 F.3d at 915. Based on the evidence submitted, CSI has failed to meet this burden.

While it is clear that BankTrade is related to and supports ABN's work in the trade finance sector – specifically by processing letters of credit and guarantees for ABN – CSI has failed to identify the ways in which ABN's profits are attributable specifically to BankTrade. For example, CSI's own witness, Donald R. Smith, suggested during his deposition that there are at least five or six core trade processing software companies that operate in the market; he stated that they all provide "a certain basic set of functionality. . . ." (See Smith Dep. at 24-27.) When asked, Smith stated explicitly that he did not know whether the revenues would have been any different had a processing system other than BankTrade been used by ABN. (Id. at 118.)

Smith testified that when he witnessed the implementation of BankTrade at another bank, he was not aware of any increase in the number of foreign exchange transactions, trade finance loans, or lines of credit issued. (See id. at 28-30.) Notably, Smith also said he was not aware of BankTrade having any impact on the number of letters of credit issued at the bank. (See id. at 30 (explaining that BankTrade "impacted the manner in which we utilized those lines of credit through automated interfaces").)

The Chief Administrative Officer of Global Trade Finance for ABN, Dermot Canavan, states that ABN does not promote its use of BankTrade to its customers – "ABN customers do not care what specific software or technology ABN uses to

24

deliver a trade finance service or product to them." (See Canavan Decl. ¶¶ 4-6, dated May 17, 2013.)  Analogous to this, when Smith was asked about whether another large bank he had worked for explicitly marketed its core trade processing system for trade finance transactions, Smith said that the focus was on the capacity to produce results, not on the technology behind that capacity.[15]  (See Smith Dep. at 49.)  Canavan also testified that throughout his time in meetings with bank employees responsible for selling trade finance products and services to ABN's customers, he never learned of a situation in which an ABN customer or prospective customer hired ABN specifically because of ABN's utilization of BankTrade. (Canavan Decl. ¶ 7.)

Moreover, the evidence before the Court shows that while ABN's capacity to provide trade finance services to its customers was perhaps aided by its use of BankTrade, the services provided by ABN are the result of a number of other factors as well.  (See Caravan Decl. ¶ 8.)  Indeed, ABN uses a number of software applications and other technologies, in addition to skilled sales and trade finance personnel, to conduct its work.  (Id.)  See Business Trends Analysts, Inc., 887 F.3d at 404 (requiring that a copyright holder seeking to show an infringer benefited from an improved commercial reputation as a result of the infringement produce evidence illustrating the benefit derived specifically from the infringement, separate and apart from other possible contributing factors).

―――――――――――

[15] Smith testified that he did not recall marketing the processing system by name. (Smith Dep. at 49.)  Smith stated: "We marketed our capability at delivering and exceeding the client's expectations."  (Id.)

25

Additionally, while CSI's papers cite to the 2001 Project Proposal for the proposition that BankTrade is critical to increasing the company's trade revenues, CSI has not provided evidence that BankTrade was itself responsible for any revenue generated by ABN years later, when ABN began infringing on CSI's copyright. The Project Proposal is prospective in nature; it pre-dated the incorporation of BankTrade into ABN's back-office processing system (indeed, this was the desired outcome of the proposal). Moreover, the Project Proposal is an internal marketing tool designed to convince decision-makers to obtain BankTrade. While this may show that certain individuals at ABN thought that BankTrade would be useful, it does not do anything to illustrate whether BankTrade in fact proved to be useful (let alone profitable) to ABN.

Jarosz states in his rebuttal report that "BankTrade does not appear to be an inconsequential element of RBS's trade finance business." (Jarosz Decl., Ex. 2 at 22.) While this may be true, that is far from setting forth the causal relationship required under the law. CSI seeks recovery from too large a swath of ABN activities. (See Jarosz Decl., Ex. 1 at 27-39.)

First, CSI does not simply seek disgorgement of the fees obtained when ABN used BankTrade to process letters of credit and guarantees; CSI does not even limit its request to solely those transactions that occurred on BankTrade. Instead, CSI seeks all sums that it believes should be credited to BankTrade, including those that did not themselves "flow through" the software. (See generally id. at 27-41.) See DaimlerChrysler Servs., 2006 WL 208787, *4 (denying indirect profits when

26

such profits are traceable to a complicated "income stream") (internal quotation marks and citation omitted).

Second, CSI essentially argues: (1) that specific transactions occurred because of BankTrade; and (2) that but-for BankTrade, certain transactions would not have occurred. (See Jarosz Decl., Ex. 1 at 21 (discussing transactions that "are a direct result of" BankTrade activity), 27 (explaining, for example, that "but for the transaction flowing through BankTrade, the currency traders would not have had the opportunity to earn the spread on that currency trade"), 33 (discussing trade financing transactions that "caused" customers to hold additional deposits or post collateral).) Yet, CSI fails to provide any evidence in support of the "causation" assertions embedded in these claims. There is no evidence that a single specific transaction would have occurred but for BankTrade or would not have occurred without BankTrade. BankTrade need not be the sole causal factor – but, there must be evidence that it is a causal factor.

Third, CSI's analysis of indirect profits covers all transactions that flowed through BankTrade, even for those customers whose banking relationship with RBS predated its acquisition of BankTrade. Jarosz referred to the "stickiness" of trade finance and Smith to the complexity of the relationships as well as specific expertise of personnel; these points undercut a causal relationship between BankTrade and pre-existing trade finance customers (those customers were already in the "sticky" relationship; those customers already had the complex relationship with banking personnel). (See Jarosz Decl., Ex. 1 at 5, 19; Smith Report at 19.) Related to this is

the fact that CSI has failed to account for pre-existing ABN trade finance customers – those who were ABN customers prior to RBS's acquisition of ABN – who were using BankTrade in a perfectly lawful manner. There is no evidence that pre-existing ABN trade finance customers engaged in post-acquisition trade finance transactions because of BankTrade.

Fourth, CSI fails to account for the fact that some customers (before and after ABN's acquisition of BankTrade) may well have their initial letter of credit without ever having their transaction run through BankTrade. (See Def.'s Mem. at 5 (explaining that ABN has four different systems to process letters of credit and guarantees – the three others being PSI, Smooth, and Score – and that whether a transaction is processed on BankTrade "is a decision made by ABN and depends on the characteristics of the transaction, including its location").) For these customers, the initial "sticky" trade finance relationship may not have been through BankTrade and therefore subsequent transactions could not necessarily be attributed to BankTrade.

Fifth, CSI fails to account for the individual credit and trade finance needs that may have factored into a customer's decision to obtain any one of the trade finance services Jarosz includes – a customer may have many reasons to need a service no matter what software was used: that need may well have entirely driven the decision to work with ABN.

The Court recognizes that there is tension between holding the leash on causation so tightly that an infringer whose business utilizes a product indirectly

can profit and not face disgorgement of such profits, and the Copyright Act's concern with protecting copyright holders from infringement.  In this ruling, the Court does not suggest that there is no scenario in which a copyright holder – and even CSI on a different record – could demonstrate a sufficient causal nexus, even when multiple factors are contributing to a company's profits.  Here, CSI has failed to meet its burden.

## CONCLUSION

For all of the reasons aforementioned, CSI has failed to make a sufficient evidentiary showing of a causal connection between BankTrade and ABN profits. Accordingly, ABN's motion in limine to preclude evidence of indirect profits is hereby GRANTED.

The Court notes that pending before the Court (but not yet fully briefed) is CSI's motion for a permanent injunction.  (See ECF No. 313.)  ABN intends to oppose that motion and has specifically sought additional time in which to "gather facts in support of its opposition."  (See ECF No. 342.)  If ABN opposes CSI's motion on a basis that requires certain factual support, the Court may allow some additional factual development of the record; under the appropriate circumstances, if such facts reveal the causal connection described as necessary above, CSI may consider whether to seek leave to allow evidence of transactions causally-related to BankTrade to go to the jury.  More would be needed than here provided.

The Clerk of Court is directed to terminate the motion at ECF No. 327.


Dated:      New York, New York
            November  8 , 2013

 

_____
            KATHERINE B. FORREST
            United States District Judge