```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 0 9 2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
COMPLEX SYSTEMS, INC.,      :
                           :
             Plaintiff,   :
        -v-                :
                           :
ABN AMRO BANK N.V.,      :
                           :
           Defendant.   :
-------------------------------------------------------X

08 Civ. 7497 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      The story of this dispute is relatively simple, despite the fact that it has been litigated for almost six years. In 2007, defendant ABN AMRO Bank N.V. ("ABN") sold some of its assets – including subsidiaries LaSalle Bank and ABN AMRO Information Technology Services Company, Inc. ("IT") – to Bank of America ("BAC") ("the LaSalle Transaction") for $21 billion.

      IT was the licensee of a software application created and licensed by plaintiff Complex Systems, Inc. ("CSI") called BankTrade. By virtue of its corporate affiliation with ABN, ABN was entitled to use BankTrade through IT and in reliance on IT's license. Following the LaSalle Transaction, IT remained the licensee. ABN did not have a separate license and was not itself a licensee.

      This did not stop ABN from using BankTrade, however. ABN has continued to use BankTrade uninterruptedly up until today. Perhaps ABN assumed that following its sale of IT it could easily obtain its own license from CSI; perhaps it assumed that somehow once IT no longer needed the license, IT could transfer it back; perhaps ABN just overlooked certain details in the throes of closing a quickly-

negotiated $21 billion deal.  Regardless, the evidence is clear that the moment the
LaSalle Transaction closed, ABN no longer had a license to use BankTrade.  The
evidence is equally clear that during the intervening period, as it tried
unsuccessfully to negotiate one for a low price, ABN knew it no longer had the
license to BankTrade.  Nonetheless, ABN hunkered down and continued apace,
even after (and despite the fact that) CSI filed this infringement lawsuit in 2008.
That alone might not be unexpected, but the decision not to develop a backup plan
in the event it lost this lawsuit is.

After six years of uninterrupted infringement by ABN, CSI prevailed on
liability.  It now seeks injunctive relief to prevent certain and ongoing
infringement.[1]

ABN resists.  ABN argues that BankTrade is too important to its trade
finance business to cease using it – it is deeply embedded as a component of a
complicated technical platform used in 22 countries (called "GTP").  ABN argues
that it has tried to negotiate a license but CSI has been commercially unreasonable
and that this Court should therefore allow ABN to use BankTrade perpetually in
exchange for a Court-imposed license – complete with financial and other terms.

---

[1] CSI requests: (1) a permanent injunction preventing ABN, and those in privity
with ABN, from further infringement, pursuant to 17 U.S.C. § 502; and (2) the
destruction or return of all unlicensed copies of BankTrade in the possession,
custody, or control of ABN, and those in privity of ABN, pursuant to 17 U.S.C. §
503(b).  (Complex System, Inc.'s Memorandum in Support of its Motion for a
Permanent Injunction, Pursuant to 17 U.S.C. § 502, and for the Destruction or
Return of All Copies of BankTrade Pursuant to 17 U.S.C. § 503(b) ("Pl.'s Mem.") at
1, Oct. 15, 2013, ECF No. 314.)

Taken to its logical conclusion, this position may be reduced to the following propositions:

- If a software application is really quite useful and relied upon (the developer would undoubtedly hope for both), once licensed, a licensee has a de facto and de jure perpetual license;

- When a licensor acts in a commercially unreasonable manner in the context of a negotiation for renewal of a useful and relied upon software application, a licensee may simply cease negotiations, continue usage, and seek the Court's assistance in setting a license fee and the other terms, thus irrevocably shifting leverage in any licensing discussion; and

- If an infringer bets it can obtain a license for its preferred price and bets wrong, the burden of that bet falls on the licensor – not on the infringer.

The Court declines to accept these propositions.[2]  CSI's motion for injunctive relief is GRANTED.

I.      FACTUAL OVERVIEW

In 1997, ABN's subsidiary, IT, and CSI entered into an initial license agreement for BankTrade ("the License Agreement").  The License Agreement allowed IT to utilize BankTrade in connection with ABN's trade finance processing services in North America.[3]  (Defendant's Opposition to Plaintiff's Motion for a

---

[2] As discussed infra, there are instances in which compulsory licenses are granted despite the licensor's resistance.  Those situations occur relatively rarely.
[3] According to Maria Bostonian-Spratt, the Director of Trade Services, Innovation & Customer Proposition for RBS (formerly, ABN), ABN had access to BankTrade source code because certain modifications to BankTrade were necessary in order to

Permanent Injunction, Pursuant to 17 U.S.C. § 502, and for the Destruction or
Return of All Copies of BankTrade, Pursuant to 17 U.S.C. § 503(b) ("Def.'s Opp'n"),
Nov. 29, 2013, ECF No. 349.) At all times thereafter, IT was the licensee of
Banktrade. The License Agreement allowed corporate affiliates of IT to use
BankTrade. (Declaration of Jeffrey I. Kaplan in Support of Complex System, Inc.'s
Combined Memorandum in Opposition to ABN's Motion for Summary Judgment
and In Support of CSI's Motion for Summary Judgment ("Kaplan 8/3/12 Decl."), Ex.
A, Aug. 8, 2012, ECF No. 170.)

 In 2000, ABN decided to consolidate its trade finance processing operations
and to use BankTrade globally. (Def.'s Opp'n at 6.) Accordingly, in 2001 and again
in 2002, CSI and IT entered into addenda to the License Agreement, for additional
licensing fees. (Id.) The 2001 addendum expanded IT's rights by: (1) allowing IT to
use BankTrade worldwide; (2) expanding IT's access to BankTrade source code; (3)
providing additional modules within the system; and (4) allowing unlimited
insourcing. (Def.'s Opp'n at 6; 3/14 Tr. 14-15.) Following the agreements, CSI and
IT worked together to customize and integrate BankTrade into ABN's global trade
finance processing platform (again, "GTP"). (Bostonian-Spratt Decl. ¶¶ 13-21.)

 The License Agreement and addenda provided that IT was the licensee; while
the agreement was non-transferable, it could be assigned to IT's subsidiaries,
affiliates, or any direct or indirect parent or any subsidiary or affiliate of such

---

use BankTrade in ABN's trade finance business. (See Declaration of Maria
Bostonian-Spratt ("Bostonian-Spratt Decl."), Ex. 1, Jan. 9, 2014, ECF No. 368.)

4

parent. (6/21/13 Opinion & Order at 4.)  The License Agreement provided the

following scope of use:

> The License granted under this Agreement authorizes the Licensee to use a required number of copies of the System in machine readable form to service all North American (i.e. Canada, United States, Mexico) entities as listed below, as permitted by the License Agreement, by the Licensor, in any location.  The copies shall be used solely for processing Licensee internal banking work of any parent, subsidiary or affiliated entity, direct or indirect, of Licensee, and not for any other purpose of entity.  A direct or indirect parent, subsidiary or affiliate of Licens[ee] shall be defined as any entity which is at least 80% owned by ABN-AMRO Bank N.V. and / or ABN-AMRO North America . . . .  No right to print or copy, in whole or in part, the System is granted hereby except as hereinafter expressly provided.

(Id.)  The 2001 Addendum added a term, "Extended Use of the System," that

provided:

> The license to the use the System granted to Licensee under the License Agreement is hereby extended to include:  1) the right to use the System to process work for unrelated business and corporate entities without restriction; and 2) the right to use the System globally without geographic restriction.  Such extended use may referred to herein as "Insourcing."

(Kaplan 8/3/12 Decl., Ex. B.)

   In October 2007, ABN was the target of a hostile bid; it responded by, <u>inter</u>

<u>alia</u>, quickly negotiating and closing its own deal:  selling a number of assets,

including its subsidiaries IT and LaSalle Bank, to BAC (again, "the LaSalle

Transaction").[4]  (Def.'s Opp'n at 7.)  At the time of the sale, LaSalle Bank and other

---

[4] On October 17, 2007, ABN was acquired by Royal Bank of Scotland ("RBS").

ABN entities actively used BankTrade in their businesses. The License Agreement provided for such usage by corporate affiliates. Prior to the closing of the LaSalle Transaction, IT did not assign the License Agreement to ABN. (See id. at 2-3.) With the closing of the LaSalle Transaction, the License Agreement went with IT to BAC. As of the closing, ABN was no longer an affiliate (or parent) of IT; it no longer had a right to use BankTrade derivatively based on the licensing rights of IT. Nevertheless, ABN continued using BankTrade post-merger and ABN concedes it continues to actively use BankTrade today. (Pl.'s Mem. at 3.)[5]

There is no credible question that ABN knew it did not have a license to use BankTrade following the LaSalle Transaction and that it continued to use the software despite this inconvenient fact. A copy of the purchase and sale agreement between BAC and ABN clearly provides that BAC (rather than ABN) will be guaranteed the license. (Kaplan 8/3/12 Decl., Ex. D;[6] 4/7 Tr. 6.)

---

[5] ABN argues repeatedly that it paid "millions" for its license to BankTrade and to integrate BankTrade into its system. It uses this assertion in support of its argument that it has "paid" for a right to use the product and that CSI's attempt to now gain millions more in additional fees is inequitable. This argument elides important points: it was IT which held the license, and ABN sold IT and all of IT's assets (including the license) to BAC in return for $21 billion. Put bluntly, ABN sold its rights – and parted with its sunk costs – in BankTrade when it accepted the $21 billion purchase price. It is not for the Court to second-guess why adequate arrangements were not made in advance of that sale to resolve what was a plain licensing issue.

[6] At oral argument, ABN objected to CSI's use of evidence included in Jeffrey Kaplan's August 3, 2012 declaration. (4/7 Tr. 39-40.) The Court accepted the submission on an oral motion, opposed by ABN, and reserved decision. (4/7 Tr. 40.) ABN has seen these documents before, the Court relied on these and other documents in connection with its liability determination, and they are relevant insofar as they provide helpful context for the injunctive relief now sought. Thus,

6

ABN understood it lacked requisite rights. An undated chart listing license agreements for various software applications shows that both ABN and LaSalle Bank would use BankTrade. (Kaplan 8/3/12 Decl., Ex. V.) The chart indicates that LaSalle Bank (including IT) is the "signing entity" for the BankTrade license. (Id.) Put in blunt terms, IT was the licensee.

On February 29, 2008, Tom Trujillo of BAC wrote to CSI that the BankTrade license "remains with the contracting LaSalle entity [e.g., IT] (which entity is among those bought by Bank of America)." (Id. at 9 (quoting Kaplan 8/3/12 Decl., Ex. F).)

A March 2008 ABN internal email states, "As you all know, BAC still owns the BankTrade software. BAC has stated they will not be off version 6.2 until October [2008] nor will we look for BAC to assign this contract to [ABN] until such time later this year. [ABN] employees or contractors should not be manipulating the software/source code. It should be managed by BAC or its contractors only at this point in time." (Id. at 10 (quoting Kaplan 8/3/12 Decl., Ex. L).)

On March 3, 2008, Sheldon Goldfarb, an attorney with RBS (which acquired ABN), wrote to CSI that "[ABN] is not a party to the License Agreement." (Id. (quoting Kaplan 8/3/12 Decl., Ex. H).)

On April 11, 2008, Holly Lussier of RBS wrote to Warren Browne at CSI: "I would like to thank you and the other members for meeting with us yesterday.

---

the Court accepts them as evidence for purposes of the motion now before this Court.

7

Pursuant to that discussion, we confirmed with you that BAC as successor in interest to [IT] is currently the licensee under the License Agreement, all addenda thereto, and the subsequent [agreement. We] would like to assign the Agreements back to ABN." (Id. at 11 (quoting Kaplan 8/3/12 Decl., Ex.G).)

An internal ABN document dated June 18, 2008 states: "[CSI] sent a notice to ABN [] stating that ABN was in breach of contract. ABN is working [] with BAC to put forward our position, which states that within the TSA there is an implicit license to ABN. Once BAC agrees with ABN's position, ABN can approach [CSI]. The issue with [CSI] will not be resolved by 7/1/08 . . . . [W]e need to go forward regardless." (Kaplan 8/3/12 Decl., Ex. X (emphasis added).)

An August 2008 contract between ABN and RBS, BAC, and BAC Services Company, Inc., formerly IT, sets forth an agreement between ABN and BAC whereby BAC "transfers" BankTrade to ABN and in exchange, ABN agrees to indemnify and hold harmless BAC should CSI bring any claim against it. (Id., Ex. FF; Supplemental Declaration of Jeffrey I. Kaplan ("Kaplan Decl."), Ex. B, Oct. 25, 2013, ECF No. 316.) No provision in the License Agreement allows for such a transfer between unaffiliated companies. The August 2008 agreement indicates that BAC agrees to cooperate with ABN in litigation, to not communicate with CSI, and to not assert any ownership rights over the License Agreement. (Id.) BAC further agrees to cooperate with ABN during litigation and to recognize ABN as the

owner of the License Agreement. (Id.)[7] Of course, this purported transfer proves liability: it would have been unnecessary if ABN had had any then-existing rights to BankTrade.

An (undated) internal document contains an entry dated March 31, 2009 that states: "CSI is expected to require a significant amount in fees for this assignment. . . The lawyers from BAC and RBS both agree . . . that BAC can't assign the contract without consent from CSI." (Kaplan 8/3/12 Decl., Ex. X (emphasis added); see also 6/21/13 Opinion & Order at 11.)

Despite all of this, ABN concedes it has not seriously begun the necessary work to transition off of BankTrade. (See 3/14 Tr. 167-68.) At the evidentiary hearing on this motion, when asked why ABN has not stopped using BankTrade, Dermot Canavan, currently the Regional Trade Product Head for Europe, the Middle East, and Africa for RBS (formerly, ABN), stated:

> It's not something we are willing to do. We have a set of processes that work now and to replace all those processes through putting a new system in place is a huge amount of work, it's a major undertaking. It doesn't give us any extra commercial advantage. We can't give anything to our clients tomorrow if we do put the new system in. And it's a huge distraction. We would need to find a lot of people to put the new systems in, to embed the new systems, take out the old systems, across 22 countries. It's a huge task.

(3/14 Tr. 167-68.)

---

[7] The agreement also allows BAC to keep a back-up copy of the software and to use BankTrade during the transition period. (Kaplan Decl., Ex. B.)

9

II.    PROCEDURAL HISTORY

On August 25, 2008, CSI filed this lawsuit. (ECF No. 1.)  In its original

Complaint, CSI sought, among other relief, a permanent injunction. (See Compl. ¶

76, Aug. 25, 2008, ECF No. 1.)  On December 29, 2008, CSI filed an amended

Complaint. (ECF No. 16.)  That amended Complaint also contained a request for

the entry of a permanent injunction. (Am. Compl. ¶¶ 55, 66, 72, 79, A, Dec. 29,

2008, ECF No. 16.)  On May 4, 2009, ABN filed its Answer. (ECF No. 27.)  The

relief CSI is seeking has never been in doubt.

On June 30, 2012, ABN filed a motion for summary judgment, contending

that ABN retained ownership over the BankTrade license post-LaSalle Transaction.

(ECF No. 159.)  On August 8, 2012, CSI filed a cross-motion for summary judgment,

arguing that IT failed to assign the license pre-LaSalle Transaction and thus, ABN

no longer had the right to operate BankTrade. (ECF No. 170.)[8]

On December 5, 2012, this matter was reassigned to the undersigned, and on

March 20, 2013, the Court denied ABN's motion for summary judgment and

granted CSI's cross-motion for summary judgment. (ECF No. 184.)  On June 21,

2013, the Court issued a corrected Opinion & Order. (ECF No. 257.)  The Court

determined that while ABN had the ability pre-closing to assign its BankTrade

---

[8] Prior to this, on June 4, 2009, CSI moved for summary judgment on the basis that
IT failed to assign its BankTrade license to ABN before the closing of the LaSalle
Transaction. (ECF No. 32.)  On July 22, 2009, ABN filed a cross-motion for
summary judgment, arguing the opposite. (ECF No. 42.)  On February 22, 2011,
these motions were withdrawn on the consent of the parties. (ECF No. 87.)

license without cost or penalty, it did not do so; it could not retroactively accomplish such assignment post-closing without the agreement of CSI.  (6/21/13 Order at 2.) No such agreement had been reached between the parties and the Court determined that ABN's ongoing use of BankTrade was therefore unlicensed.  (Id.)

On April 18, 2013, CSI filed a motion for summary judgment as to ABN's remaining defenses.  (ECF No. 202.)  Thereafter, and of particular relevance here, on November 1, 2013, ABN filed a motion in limine to exclude evidence of indirect profits.  (ECF No. 327.)  In contrast to ABN's current argument that BankTrade is a core, irreplaceable component of GTP, ABN downplayed its significance in connection with this motion, arguing that BankTrade is simply a back-office software application.  (See Defendant's Memorandum of Law in Support of its Motion in Limine on Damages under Section 504(b) of the Copyright Act ("Def.'s MIL Mem.") at 3, Nov. 1, 2013, ECF No. 328.)  ABN contended BankTrade was – while necessary – insignificant, replaceable, and a non-factor in ABN's profits.  ABN explained: "While ABN uses BankTrade to process letters of credit and guarantees, ABN also uses electricity, telephones, and computers, and – indeed – commodes. CSI is no more entitled to ABN's profits from its letters of credit and guarantee business than is the company that makes or the plumber who installs ABN's toilets."  (Id. at 18.)

On November 8, 2013, the Court granted ABN's motion in limine to preclude evidence of indirect profits.  (ECF No. 344.)  The Court explained:  "While it is clear that BankTrade is related to and supports ABN's work in the trade finance sector –

specifically by processing letters of credit and guarantees for ABN – CSI failed to identify the ways in which ABN's profits are attributable specifically to BankTrade." (11/8/13 Opinion & Order at 24.)  The Court reasoned that while ABN's capacity to process trade finance transactions was perhaps aided by the use of BankTrade, ABN processed the transactions because of a number of other factors as well.  (Id. at 25.)

Additionally, trade finance products are "sticky," meaning they are connected to other products offered by banks and generate additional income via lines of credit, overdrafts, loans, etc.  (Id. at 15.)  ABN allegedly generated revenue in a number of areas as a result of its trade financing processing, and thus, BankTrade. This Court found that the multitude of interconnected factors made the profits allegedly obtained by ABN as a result of using BankTrade difficult to measure.

On October 17, 2013, the Court granted CSI's motion for summary judgment. (ECF Nos. 310, 318.)  The Court deemed ABN's claims and remaining defenses unavailing, specifically determining that:  (1) IT did not own a BankTrade license; (2) CSI had not expressly authorized ABN to use BankTrade in a way that survived the LaSalle Transaction; and (3) CSI had not granted ABN an implied license to use BankTrade through its conduct.  (10/17/13 Opinion & Order at 8.)

Eight days later, on October 25, 2013, CSI filed a motion for a permanent injunction.  (ECF No. 313.)[9]  CSI seeks to compel ABN to stop using BankTrade and

---

[9] ABN makes much of the fact that CSI did not move for a preliminary injunction at the outset of this litigation.  This fact is, of course, not determinative of whether permanent injunctive relief is appropriate.  See, e.g., Metso Minerals, Inc. v.

12

to return all existing copies of the software. CSI's motion for a permanent
injunction became fully briefed on January 6, 2014.[10]  The Court held an
evidentiary hearing on the motion on March 14, 2014; on April 7, 2014, the parties
presented closing arguments.

III.   FACTUAL FINDINGS

In connection with this motion, the Court received evidence in the form of
declarations, exhibits, and live testimony. The following constitutes the Court's
findings.

a. BankTrade

At the evidentiary hearing, the Court heard live testimony from CSI's
founder, Gad Janay. The Court found Janay knowledgeable, forthright, and
credible. He appeared serious about protecting his business and sincere in his
statements regarding the harm CSI has and will suffer as a result of ABN's

---

Powerscreen Int'l Distrib. Ltd., 788 F. Supp. 2d 71, 75-76 (E.D.N.Y. 2011). It is all
the more unpersuasive in light of CSI's expeditious request for a permanent
injunction following the Court's October 17, 2013 decision granting summary
judgment in favor of CSI. CSI also reasonably explained its calculation to not seek
preliminary injunctive relief: because of its view that indirect damages should be
recoverable (a position with which this Court has disagreed given the difficulties
inherent in measuring such damages), it reasonably expected that bonding any such
injunction would be prohibitively expensive (such damages were alleged to be in the
hundreds of millions of dollars). No one predicted how long this relatively
straightforward litigation would take.
[10] On January 15, 2014, ABN filed a supplemental memorandum of law in further
support of its opposition to CSI's motion. (ECF No. 374.)

infringement, as well as the harm a compulsory license will have on ongoing attempts to license BankTrade to other companies.[11]

CSI is the copyright holder for BankTrade, a sophisticated software system for back office trade finance processing. (Declaration of Gad Janay in Support of Plaintiff's Motion for a Permanent Injunction and the Destruction or Return of all Copies of BankTrade in the Possession, Custody[,] or Control of ABN ("Janay 10/25 Decl.") ¶¶ 1, 5, Oct. 25, 2013, ECF No. 315.) BankTrade is primarily used for processing letters of credit and guarantees, though it has a number of other capabilities as well.[12] (Id. ¶¶ 5, 6.) CSI's business is two-fold: (1) it licenses BankTrade to banks; and (2) it installs the BankTrade software, trains users, and maintains the software on behalf of its users. (3/14 Tr. 8.)

CSI's annual revenues are between roughly $18 and $20 million. (3/14 Tr. 65.) It has approximately 100 licensees, including RBS (which was a client prior to

---

[11] Dermot Canavan and Maria Bostonian-Spratt testified credibly on behalf of ABN at the hearing.

[12] BankTrade facilitates and/or offers all of the following: (1) letters of credit processing; (2) standby letters of credit processing; (3) guarantees processing; (4) collections processing; (5) reimbursement processing; (6) payments processing; (7) trade finance loans and discounts, banker's acceptances processing and discount, funds transfer processing, and foreign exchange processing; (8) integration module with the software applications ClientTrade, SWIFT and Bolero; and (9) integration tool kit for other non-CSI front end applications. (Janay 10/25 Decl. ¶ 6.) Additionally, BankTrade "provides a number of additional components that enhance the usability of BankTrade, including, workflow management, imaging, and document preparation." (Id.)

the LaSalle Transaction),[13] Citizen's Bank, ING, Wespac, National Bank of Kuwait, Banco Santander, etc.  (3/14 Tr. 9.)

   b.  ABN

ABN has more than 2,621 trade finance clients that use its GTP system.  In one way or another, these trade finance clients "touch" BankTrade.[14]  (Declaration of Dermot Canavan ("Canavan Decl.") ¶ 13, Jan. 9, 2014, ECF No. 367.)  Each week, ABN processes an average of 3,089 new trade finance transactions (letters of credit, guarantees, and documentary collections) on GTP.  (Id. ¶¶ 15-16.)

   c.  Insourcing

ABN is in the business of insourcing the trade finance processing needs of third party banks.  It uses BankTrade in connection with this business.  Clients who "outsource" trade finance to ABN would have the option of themselves licensing BankTrade from CSI and processing their own trade finance transactions.  Accordingly, ABN and CSI are both in the business of providing third parties with the capability to process trade finance transactions.  CSI provides such capabilities by way of licenses to, and service of, its BankTrade application, which is installed on a bank's servers (i.e., the "do it yourself" model).  ABN, on the other hand, provides a "full service" offering, with its own computer system and personnel.  (See

---

[13] The RBS license is separate from that at issue here.  Its scope does not cover ABN's actions in this case.
[14] ABN uses GTP to process documentary letters of credit, guarantees, and documentary collections.  (Bostonian-Spratt Decl. ¶¶ 56-57.)

3/14 Tr. 92; see also 3/14 Tr. 136 (ABN is "in the mix in many places; the banks tell us [CSI] they're considering also insourcing").)

Pursuant to the 2001 License Agreement addendum, IT obtained from CSI the right to provide global, unrestricted insourcing. (Declaration of Gad Janay in Support of Plaintiff's Motion for a Permanent Injunction and the Destruction or Return of All Copies of BankTrade in the Possession, Custody[,] or Control of ABN ("Janay Decl.") ¶¶ 3-5, Jan. 6, 2014, ECF No. 359.) As a result, affiliates of IT could enter into agreements with third party banks whereby IT affiliates would process trade finance transactions for the third party banks using BankTrade, without sharing any revenue or providing any continuing financial benefit to CSI. At present, ABN has insourcing agreements with several companies, including KeyBank and Allied Irish Bank.

Over time, CSI realized that allowing its clients to engage in unlimited insourcing without revenue sharing was detrimental to CSI's business because it enabled BankTrade users to compete with CSI for business. (Id. ¶ 8.) CSI would not enter into a license similar to that which it entered with IT regarding insourcing today. CSI contends that ABN contacted existing CSI customers and attempted to lure them from using BankTrade on their own systems to outsourcing to ABN. (3/14 Tr. 25; see also Janay Decl. ¶ 12.) The parties dispute whether this has in fact occurred; that it could is undisputable.

There is no doubt that ABN's capabilities – built on BankTrade – and BankTrade's customer base (banks just like ABN that choose to perform trade

16

finance processing in-house) compete. At the evidentiary hearing, the parties proved this point by debating the status of KeyBank, Allied Irish Bank, Barclays Bank, Bank of Ayudhya, Bank of Asia, and PT Bank Mandiri. (Janay Decl. ¶ 10; see also 3/14 Tr. 25, 30.) While the facts do not support CSI having in fact "lost" one of these accounts to ABN, it is unclear whether the fact that CSI and ABN were competing against each other played any role in any third parties' decision-making.[15] The record demonstrates that CSI and ABN have and will continue to compete for customers seeking to provide clients with trade finance processing services.

### d. Infosys

Infosys, based in India, provides information technology services. (3/14 Tr. 40-41, 99, 101.) Infosys both "manufactures and sells its own trade finance software which directly competes with BankTrade," (Janay Decl. ¶ 17) and additionally, provides maintenance and customization services for BankTrade. In 2005, ABN hired Infosys to maintain BankTrade and provided Infosys with BankTrade source code. (Janay 10/25 Decl. ¶ 17; 3/14 Tr. 40; Janay Decl. ¶ 23.) Any derivative right that Infosys had to CSI's source code evaporated when IT was sold to BAC. Janay

---

[15] Long prior to the sale of IT to BAC, CSI was aware that ABN would be providing insourcing services to KeyBank. There is no evidence in the record regarding when any such agreement between KeyBank and ABN is up for renewal, thereby allowing for additional competition for the account.

testified credibly that CSI is concerned that Infosys's access to source code gives Infosys a competitive advantage to CSI's detriment.[16] (Janay Decl. ¶ 23.)[17]

### e. Access to Source Code/Maintenance

CSI obtains about one-third of its revenue from fees associates with maintaining BankTrade on its licensees' computers. Use of the BankTrade source code is necessary to such maintenance work. (3/14 Tr. 17.)

From 2005 on, Infosys and ABN have worked together to use, modify, and update BankTrade and its code without input from CSI. (Janay Decl. ¶ 13; see also 3/14 Tr. 19.)

For the most part, CSI avoids these types of agreements today. CSI does not allow a licensee to terminate a single license provision (e.g., maintenance) without terminating the entire license. (Janay Decl. ¶ 13; 3/14 Tr. 40.) While CSI still sometimes grants access to source code, it does so not to enable internal modification, but rather as a backup: it generally places the source code into "escrow," accessible only upon the triggering of certain conditions. (3/14 Tr. 83.)

---

[16] Infosys has had access to BankTrade source code since 2005. There are no known breaches of confidentiality to date. (Declaration of Raymond Crescenzi ("Crescenzi Decl.") ¶¶ 15-16, Jan. 9, 2014, ECF No. 365; see also Declaration of John C. Garces in Opposition to Plaintiff's Motion for a Permanent Injunction, Pursuant to 17 U.S.C. § 502, and for the Destruction or Return of all Copies of BankTrade, pursuant to 17 U.S.C. § 503(b) ("Garces Decl.") ¶ 49, Ex. 1, Jan. 9, 2014, ECF No. 369; 3/14 Tr. 101.)

[17] When asked what he wanted with respect to Infosys, Janay testified: "Get off the system, return to us everything, and stop access[ing] or having access or usage on BankTrade. If I could say, erase some things off people's minds, [I'd] ask to do that, too." (3/14 Tr. 41.)

### f. Reputational Harm

It is undisputed that CSI has made many improvements and modifications to BankTrade since 2007. CSI's current version of BankTrade is 15.1; ABN runs BankTrade version 8.0. This difference in versions results in differences in capabilities, functionality, and quality. ABN's BankTrade runs on a legacy IBM mainframe, which according to Janay is "old architecture and an old system;" CSI's BankTrade "runs on any hardware in the marketplace today[,] including the most modern Windows, Unix, Linux, AS400," etc. (3/14 Tr. 39.)

CSI claims that as a result of insourcing and ABN's ability to maintain and modify BankTrade, CSI has suffered reputational harm. Janay testified credibly that "at shows like Sibos [an annual conference for the industry] . . . , customers came [up] to [Janay and other CSI team members] . . . and [said], how come BankTrade does not do serving functions? We are having problems with BankTrade[.] Our experience at ABN is so on and so forth." (3/14 Tr. 36.) According to Janay, these individuals had false impressions of BankTrade's capabilities as a result of ABN's use of the outdated, modified version of the software. Similarly, Janay testified credibly that at one point, he received a complaint that BankTrade could not "offer a more flexible commission rate" or the "ability to participate in certain documents," but that here again, these were actually problems with ABN's outdated, modified version of BankTrade. (3/14 Tr. 38.)

Janay also testified that ABN's decision to provide its own updates and maintenance hurts CSI's reputation because it suggests that CSI is incapable of maintaining BankTrade for a large, global client. (3/14 Tr. 36, 38.)  Janay testified that based on what he understands regarding competitive dynamics, ABN has capitalized on this notion in its marketing efforts to potential insourcing clients. (3/14 Tr. 36.)  "When [ABN] is in a competitive sales situation for insourcing [against CSI for licensing], whether for existing customers or potential customers, they are using it as part of their sales pitch.  We are maintaining it.  They are a small company.  We are global." (3/14 Tr. 36.)

The Court found Janay's testimony regarding the reputational harm suffered by CSI credible.  Janay is concerned and frustrated by the degree of reputational harm CSI has and will continue to suffer as a result of ABN's conduct.

g.  <u>Licensing Efforts Between Parties</u>

There have been a number of occasions since this litigation began when ABN and CSI attempted to negotiate a new licensing agreement.  On February 27, 2008, Janay wrote a letter to RBS CEO Sir Fred Goodwin indicating that CSI may be amenable to a new licensing agreement with ABN.[18]  (Garces Decl., Ex. 1.)  About

---

[18] Contrary to ABN's characterization of the document, Janay did not write that RBS "should" come to a new agreement with ABN.  (Garces Decl. ¶ 3.)  Janay wrote: "Complex hereby demands damages for the unauthorized use by ABN AMRO Bank N.V. of BankTrade to date and further demands that, unless and until Complex and The Royal Bank of Scotland Group, either directly or through its subsidiary ABN AMRO Bank N.V., can come to terms on a new BankTrade license agreement, The Royal Bank of Scotland Group immediately cease all further use of the BankTrade software system." (Garces Decl., Ex. 1.)

six weeks later, on April 16, 2008, CSI's Chief Financial Officer, Charles Griffis, wrote a letter to RBS in-house counsel Hollie Lussier offering to license the BankTrade software to ABN for $310 million, with additional rights including insourcing, source code, maintenance, and assignability as additional "items for negotiation." (Id. ¶ 4, Ex. 2.) Janay testified credibly that the purpose of this offer was to force ABN off the system rather than to open the door to negotiations. (3/14 Tr. 44.) Janay explained that CSI did not expect ABN to pay the $310 million licensing fee; the message was "okay, for $310 million, you can use the system, but other than that, get off." (3/14 Tr. 44.) In sum, Janay's view was that if ABN would pay a price that was the equivalent of buying the company, ABN could have BankTrade. He did not have any expectation that this would occur.

That being said, on April 21, 2008, Janay wrote an internal email to CSI's Jack Eisner, Charles Griffis, and Warren Brown about a conversation he had with Mike Lofgren from RBS. (Garces Decl. ¶ 5, Ex. 3.) In the email, Janay states that he told Lofgren: "Jack is the negotiator and his job is to bring the parties together, you should discuss the issues with him." (Id.) Janay explained: "[W]e at CSI feel we have been misled by ABN when we signed the License [A]greement, and that thank[] god we now have a chance for a do over, and we are looking to negotiat[e] a new agreement with RBS based on fair terms to both CSI and the bank." (Id.) In an April 25, 2008 email, Eisner wrote to Janay that he told Lofgren that "my job is to reason together a price that we can both have our organizations sign off on." (Id. ¶ 6, Ex. 4.)

21

In the end, of course, ABN and CSI were unable to reach an agreement for a new license.[19]

### h. Transition Off BankTrade

The parties do not dispute that ending ABN's use of BankTrade cannot be accomplished overnight. ABN has had five-plus years (since the lawsuit was filed) to effect such a transition or plan for an orderly transition in the event it lost the lawsuit, but apparently has not done so.

It would take ABN between 18 and 32 months to transition off of BankTrade.[20] ABN's sudden termination of its use of BankTrade would likely render GTP, the larger system which uses BankTrade as a component, essentially unusable for a period of time. (See Bostonian-Spratt Decl. ¶¶ 9, 18-19.) For

---

[19] On February 28, 2014, ABN filed a motion in limine to admit evidence of certain settlement offers made by CSI to sell ABN a license to use BankTrade, one in May 2008 and another in January 2014. (ECF No. 391.) On March 13, 2014, the Court denied ABN's motion under Rule 408 of the Federal Rules of Civil Procedure. (ECF No. 412.) On March 27, 2014, ABN filed a motion for reconsideration. (ECF No. 418.) The Court now denies that motion. The offers fall plainly under Rule 408 for the reasons explained in the Court's March 13, 2014 decision, and in any event, even were the evidence of settlement discussions admitted, the outcome would be the same. The record already makes clear that there were attempts to negotiate a new licensing deal and that those efforts failed. To the extent ABN argues that such discussions prove there is a dollar amount that CSI would accept for a license, and that this disproves any irreparable harm, ABN is – based on the many facts in the record – wrong. (See infra.)

[20] CSI suggests that the Court need not decide how long the transition off BankTrade should take. (4/7 Tr. 22.) Instead, CSI proposes that the Court allow ABN to continue accepting trade finance transactions using BankTrade for a set period of time; upon the expiration of that time period, there should be a hard stop on new transactions. (4/7 Tr. 22.) CSI explains: "Let them just stop using it and they come off BankTrade and they get a new system from a competitor for a year or two." (4/7 Tr. 23.)

example, ABN's clients are provided with a software application, MaxTrad, that allows them to conduct their trade finance business – the data from MaxTrad is transmitted to and from BankTrade. (<u>Id.</u> ¶ 22.) BankTrade similarly is linked to a number of other GTP applications, including: Business Intelligence Repository ("BIR"), which is used to report on revenues/fees earned by ABN, including for transactions processed at least in part on BankTrade; Standing Instruction Repository ("SIR"), which provides data and instructions to BankTrade for the processor to view when transactions are processed using BankTrade; and a number of other applications as well. (<u>Id.</u> ¶¶ 28-38.)

BankTrade is not the only software application which can facilitate trade finance transactions – CSI has a number of competitors. Indeed, ABN itself uses multiple software applications providing trade finance capabilities, including Smooth, Score, and PSI. ABN states that these systems cannot immediately replace BankTrade due to their current configurations. (<u>Id.</u> ¶¶ 48-49; <u>see also</u> Declaration of Sophie Harbour ("Harbour Decl.") ¶¶ 15, Jan. 15, 2014, ECF No. 377.) ABN's various GTP software applications are deeply integrated with BankTrade. (3/14 Tr. 195.)

IV.   DISCUSSION

  a. <u>Legal Framework</u>

The Copyright Act provides that a court may grant a permanent injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Injunctions relating to copyright infringement are

governed by principles of equity and are within the discretion of the court. See

eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 394 (2006) ("We hold that the

decision whether to grant or deny injunctive relief rests within the equitable

discretion of the district courts, and that such discretion must be exercised

consistent with traditional principles of equity . . . .").

To determine whether injunctive relief is appropriate, the court must

examine whether the party seeking the injunction has satisfied the following four

requirements:

> (1) that it has suffered an irreparable injury; (2) that
> remedies available at law, such as monetary damages, are
> inadequate to compensate for that injury; (3) that,
> considering the balance of hardships between the plaintiff
> and defendant, a remedy in equity is warranted; and (4)
> that the public interest would not be disserved by a
> permanent injunction.

Id. at 392-93 (citations omitted); see Salinger v. Colting, 607 F.3d 68, 77-78 (2d Cir.

2010) (applying the standard to a preliminary injunction in a copyright case);

Warner Bros. Entm't, Inc. v. RDR Books, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008).

While "[t]he grant of injunctive relief is an extraordinary remedy," Silverstein

v. Penguin Putnam, Inc., 368 F.3d 77, 84 (2d Cir. 2004) (citations omitted), "[i]n the

copyright realm, it has been said that an injunction should be granted if denial

would amount to a forced license to use the creative work of another." Id. (citations

omitted); see also SimplexGrinnell LP v. Integrated Sys. & Power, Inc., 642 F. Supp.

2d 167, 197 (S.D.N.Y. 2009) (Lynch, J.); National Football League v. Primetime 24

Joint Venture, No. 98 Civ. 3778, 1999 WL 760130, at *4 (S.D.N.Y. Sept. 27, 1999).

24

"[P]ermanent injunctions are generally granted where liability has been established and there is a threat of continuing infringement." US Home Entm't, Inc. v. Fu Shun Wang, 482 F. Supp. 2d 314, 319 (E.D.N.Y. 2007); see also Marshall v. Marshall, No. 08 Civ. 1420, 2012 WL 1079550, at *29 (E.D.N.Y. Mar. 30, 2012) (internal quotation marks and citation omitted); Hounddog Prods., L.L.C. v. Empire Film Grp., Inc., 826 F. Supp. 2d 619, 634 (S.D.N.Y. 2011) (granting injunctive relief because "[t]he only remedy that can prevent such infringement" is an injunction and because defendant's "conduct hardly suggests that it will refrain from infringing [p]laintiffs' copyright in the future."); Granite Music Corp. v. Center St. Smoke House, Inc., 786 F. Supp. 2d 716, 730 (W.D.N.Y. 2011) (citations omitted); Realsongs, Universal Music Corp. v. 3A N. Park Av. Rest Corp., 749 F. Supp. 2d 81, 93 (E.D.N.Y. 2010) (citation omitted).  "In many instances, injunctive relief may be the best or only way to preserve the exclusivity of a copyright." National Football League, 1999 WL 760130, at *4.

   b.  Irreparable Harm – Legal Framework

   To obtain permanent injunctive relief, the moving party must show irreparable injury. eBay, Inc., 547 U.S. 392-93. "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." Salinger, 826 F. Supp. 2d at 81.

   There are many ways to demonstrate irreparable harm.  "A plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to

continue infringing its copyright(s)." Hounddog Prods., L.L.C., 826 F. Supp. 2d at
632 (internal quotation marks and citations omitted); see also Granite Music Corp.,
786 F. Supp. 2d at 730 ("Accordingly, the circumstances of this action support
granting a permanent injunction . . . because without such injunction [d]efendants
who, to date, have steadfastly refused to execute a licensing agreement, will likely
continue to permit public performances of copyrighted musical compositions . . .
without the requisite license to do so") (citations omitted); Realsongs, Universal
Music Corp., 749 F. Supp. 2d at 93 (explaining that "permanent injunctions will
only be given where there is a substantial likelihood of future infringements")
(internal quotation marks and citation omitted); SimplexGrinnell LP, 642 F. Supp.
2d at 196-97 (citing Warner Bros. Entm't, 575 F. Supp. 2d at 553); BMG Music v.
Pena, No. 05 Civ. 2310, 2007 WL 2089367, at *5 (E.D.N.Y. July 19, 2007).

There are various sorts of competitive impacts which may constitute
irreparable harm.  For instance, "[i]t is well-established that a movant's loss of
current or future market share may constitute irreparable harm." Grand River
Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 67 (2d Cir. 2007) (citations omitted);
see also i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010); Abbott
Labs. v. Sandoz, Inc., 544 F.3d 1341, 1362 (Fed. Cir. 2008); Register.com, Inc. v.
Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004); Muze, Inc. v. Digital On-Demand, Inc.,
123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000) (citations omitted).  A loss of goodwill or
reputation similarly may constitute irreparable harm. See, e.g., Metso Minerals,

Inc., 788 F. Supp. 2d at 74-75 (citations omitted); CJ Prods. LLC v. Snuggly Plushez LLC, 809 F. Supp. 2d 127, 145 (E.D.N.Y. 2011).

For example, in Muze, Inc. v. Digital On-Demand, Inc., the court determined that plaintiff was irreparably injured because defendant's unauthorized use and misappropriation of plaintiff's music database enabled defendant to compete directly with plaintiff's core business.  123 F. Supp. 2d at 129-131.  The court determined that "such misuse threatens imminent injury to the economic value of the goodwill and reputation associated with [plaintiff's] product," and thus, a (preliminary) injunction was warranted.  Id. at 130.

Similarly, in CJ Products LLC v. Snuggly Plushez LLC, the court held that plaintiff suffered irreparable harm sufficient to warrant a preliminary injunction where defendant put counterfeit versions of plaintiffs' products into the market. 809 F. Supp. 2d at 145.  The court determined that the products, "which look remarkably similar to plaintiffs' product line, have resulted and will likely result in confusion among customers, as well as lost sales and loss of goodwill for plaintiffs." Id. (citation omitted).  The court held that both lost sales and the impairment of plaintiffs' reputation, "achieved through considerable time and effort," was irreparable with monetary damages.  Id.

Direct competition may therefore constitute irreparable harm.  See Abbott Labs., 544 F.3d at 1361-62 (citing cases); cf. Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP, 403 F. App'x 591, 592 (2d Cir. 2010) (holding that the record below was insufficient to determine plaintiff would suffer irreparable harm absent

injunctive relief because "[i]t appears no evidence was submitted to the district court regarding [plaintiff's] loss of market share or clients following [defendant's] acquisition and use of the allegedly infringing software").

Difficulty in calculating damages may also demonstrate irreparable harm. Salinger, 607 F.3d at 81 ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure."); see also Register.com, Inc., 356 F.3d at 404 ("[I]rreparable harm may be found where damages are difficult to establish and measure."). Indeed, "to prove the loss of sales due to infringement is notoriously difficult." Salinger, 607 F.3d at 81 (internal quotation marks, alteration, and citation omitted); see, e.g., Technimed SRL v. Kidz-Med, Inc., 763 F. Supp. 2d 395, 410-11 (S.D.N.Y. 2011) (explaining that because customers were likely to mistake defendant's product for plaintiff's and because defendant's product is far less expensive than plaintiff's, the "damages are inherently difficult to quantify, because 'it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come'") (quoting Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999)); CJ Prods. LLC, 809 F. Supp. 2d at 149.

c.  Irreparable Harm Discussion

CSI has suffered and will continue to suffer irreparable harm as a result of ABN's use of BankTrade.

ABN's primary arguments against a finding of irreparable harm are two-fold: (1) that CSI has failed to present evidence of <u>actual</u> irreparable harm (e.g., actual lost sales in competition with ABN, actual reputational harm, or actual loss of market share); and that (2) CSI is in the business of licensing its product and being required to license (via a compulsory license) could thus not harm CSI's business. With respect to the latter argument, ABN devotes significant time to the fact that at various points during this litigation, CSI offered to license BankTrade to ABN for a price – a commercially unreasonable price, but a price nonetheless. This, according to ABN, demonstrates better than anything else could that CSI's damages are compensable by a monetary award and thus not "irreparable." ABN misapplies the facts to the case law.

As an initial matter, the record is overwhelmingly clear that CSI's efforts to provide banks with trade finance processing capabilities, and ABN's efforts to do the same, are directly competitive. Indeed, the fact that CSI and ABN are both competing for the dollars banks spend on trade finance processing is dispositive; not whether a particular client has yet in fact been taken by ABN at CSI's expense. Thus, ABN's arguments knocking off CSI's proof as to the various banks misses the point. The point is not that a specific lost customer can today be shown, but that CSI and ABN are competing in the same marketplace for the same set of clients. Based on the evidence, the Court finds that CSI and ABN do compete and that CSI is at risk of losing customers in competition with ABN. <u>See, e.g.</u>, <u>Abbott Labs.</u>, 544 F.3d at 1362; <u>Cf.</u> <u>Esbin & Alter, LLP</u>, 403 F. App'x at 592.

Similarly, CSI has put forward credible evidence that third parties misunderstand ABN's BankTrade platform – which uses version 8.0 – with the capabilities CSI's BankTrade – version 15.1.  This creates reputational harm. Janay testified that customers have approached him and said, for example:  "We are having problems with BankTrade . . . .  Our experience at ABN is so on and so forth."  (3/14 Tr. 36.)  Janay testified that potential customers "assume immediately that [ABN's] BankTrade has the same feature[s], that it's the same BankTrade [as CSI's BankTrade]."  (3/14 Tr. 38.)

ABN argues that Janay's testimony is too general; that it is not based on sufficiently concrete evidence.  The Court disagrees.  The Court credits Janay's testimony.  Moreover, the facts are plain and the danger is real:  ABN uses version 8.0; ABN's use of "BankTrade" is no secret; CSI's current version is 15.1; Janay has received specific comments regarding the lack of BankTrade capabilities at ABN. Thus, reputational harm has occurred and is likely to continue absent injunctive relief.  ABN lacks any intrinsic right to use an older, more limited version of BankTrade, thereby giving third parties false impressions about BankTrade.  See CJ Prods. LLC, 809 F. Supp. 2d at 156 (in trademark context, explaining that losing control over one's reputation constitutes irreparable harm); Metso Minerals, Inc., 788 F. Supp. 2d at 74-75 ("[W]hen a plaintiff can show that infringement caused a loss of value in its business that is difficult to quantify – such as market share, goodwill, or reputation – then the plaintiff is more likely to have been irreparably injured.") (citations omitted); Register.com, Inc., 356 F.3d at 404 (affirming a

district court's determination that irreparable harm existed "through loss of reputation, goodwill, and business opportunities"); Muze, Inc., 123 F. Supp. 2d at 131-32 (holding that plaintiff met its burden of proving irreparable harm in part because defendants' misuse of the product at issue "threaten[ed] imminent injury to the economic value of the goodwill and reputation associated with Muze's product").

Beyond these obvious harms, it is certain that CSI's damages are difficult – nearly impossible – to quantify.  Indeed, this Court has already so held in connection with its ruling on CSI's desire to proffer evidence of indirect damages. (ECF No. 344.)  In that decision, this Court stated that such damages are necessarily buried within layers of interlacing factors, greatly complicating questions of causation.  As a result, disaggregating profits attributable to the use of BankTrade would be extremely challenging, if it could be done at all.  "The profits associated with ABN's use of BankTrade are necessarily indirect:  they are based on assumptions regarding the use of BankTrade to lead to a transaction, which may lead to subsequent transactions (and subsequent profits) for ABN (and RBS)." (11/8/13 Opinion & Order at 23.)  The Court explained in its November 8, 2013 decision that the evidence illustrates that "while ABN's capacity to provide trade finance services to its customers was perhaps aided by its use of BankTrade, the services provided by ABN are the result of a number of other factors as well."  (Id. at 25.)  See Salinger, 607 F.3d at 81 (explaining that irreparable harm may exist where damages are difficult to quantify); Register.com, Inc., 356 F.3d at 404

("[I]rreparable harm may be found where damages are difficult to establish and measure") (citation omitted).

In addition, to deny injunctive relief would convey to licensees that they hold the ultimate trump card in any negotiation with CSI: if they reach an impasse, they could simply keep using the software and ask the Court to impose a license complete with fee and other business terms. This would have far-reaching and unknowable consequences for CSI's ability to effectively negotiate. Its core business involves negotiation. Such a transfer of leverage would have untold impacts on the ultimate finance and business terms of CSI's licenses going forward. This constitutes irreparable harm.

In support of its argument that CSI has not suffered irreparable harm, ABN relies on Computer Generated Solutions, Inc. v. Koral, No. 97 Civ. 6298, 1998 WL 1085945 (S.D.N.Y. Dec. 9, 1998). There, the court determined that plaintiff failed to prove a likelihood of irreparable harm in the context of a preliminary injunction because "the mere use of works without paying royalty fees when such works ordinarily would be available in return for payment of such fees" could be fully compensable with monetary damages. Id. at *1. Competition between plaintiff and defendant, reputational harm, and difficulties in quantifying damages from infringement are not discussed (as they are here). Generally, the court did not discuss whether irreparable injury would exist if the injury was more than merely owed royalty fees. The court similarly did not discuss whether irreparable harm would exist if the work – which happened to be copyrighted software – would not

have been voluntarily made available by plaintiff to defendant in exchange for a royalty fee.[21]  CSI has stated that it will not voluntarily grant ABN permission to continue using BankTrade – or to exercise rights under a license agreement dating back a decade that contains terms it now would not grant.

ABN also cites International Business Machines Corp. v. BGC Partners, Inc., No. 10 Civ. 128, 2010 WL 1924715 (S.D.N.Y. May 12, 2010).  That case is not controlling and is unpersuasive applied to the facts before this Court.  In International Business Machines Corp., the court relied on the fact that the only claim of irreparable harm made by plaintiff was that it was going to lose its ability to negotiate its licenses.  Id., at *1.  The various facts which may have been at play there are unknown to this Court; but this Court notes that an inability to negotiate licenses can certainly be a form of irreparable harm; the shift in leverage would permeate all aspects of the business relationship, perhaps resulting in foregone revenues, concessions on terms on a less than optimal basis, and incidental discouragement of and reduced innovation.  Of course, CSI has proven a variety of forms of irreparable harm, only one of which being the loss of ability to independently negotiate licenses to BankTrade.

---

[21] The court did state:  "Plaintiff's claim that in the absence of an injunction, others might be tempted to use its systems without paying for them is downright laughable.  If that were the standard, every claim for breach of contract and the like would warrant injunctive relief, lest others be tempted to violate contracts as well. The argument falls of its own weight."  Computer Generated Solutions, Inc., 1998 WL 1085945, at *2.

ABN also relies on a recent Federal Circuit case, <u>Apple Inc. v. Samsung Electronics Co.</u>, which held that in order to prove irreparable injury in a patent case, a party must show not only that it will suffer irreparable harm if the injunction is not granted, but additionally, the existence of "a sufficiently strong causal nexus [between] the alleged harm [and] the alleged infringement." 695 F.3d 1370, 1374 (Fed. Cir. 2012). "The relevant question is not whether there is some causal relationship between the asserted injury and the infringing conduct, but to what extent the harm resulting from selling the accused product can be ascribed to the infringement." <u>Id.</u> at 1375.

In <u>Apple</u>, the court deemed the district court's decision insufficient in part because the court failed to find that consumers purchased the allegedly infringing product <u>because</u> it was equipped with the patent at issue (namely, a unified search function also used in the iPhone's "Siri"). <u>Id.</u> at 1376. The court explained:

> A laptop computer, for example, will not work (or work long enough) without a battery, cooling fan, or even the screws that may hold its frame together, and its value would be accordingly depreciated should those components be removed. That does not mean, however, that every such component is "core" to the operation of the machine, let alone that each component is the driver of consumer demand.

<u>Id.</u> Without a determination that consumers purchased the allegedly infringing product <u>because of</u> the allegedly infringing patent, the court determined that a finding of irreparable harm was unwarranted.

In contrast to the situation in <u>Apple</u>, and indeed, in total contradiction to ABN's prior arguments regarding the utility of BankTrade, ABN itself now argues

that BankTrade is a "core" feature to GTP.  According to ABN, taking BankTrade out of GTP would be like removing the system's heart.

However, the situation before this Court is not similar to that in <u>Apple</u>.  It is not concerned with the sale of a consumer good; there are many more forms of irreparable harm at play here than discussed in <u>Apple</u>.  Here, there is competition between the parties which this Court has found is causally related to lost customers; there is reputational harm directly and causally related to ABN's use of an older, outdated version of BankTrade; there are difficulties measuring damages causally related to the use of BankTrade; etc.  This case is not analogous to <u>Apple</u>.

    d. <u>Balance of Hardships</u>

The balance of hardships here tips decidedly in favor of CSI.

A victory for ABN on this motion would have the sweeping result of imposing a perpetual, compulsory license on CSI.  At oral argument, this Court inquired if ABN was seeking a perpetual license; it conceded it was.  CSI's business is licensing BankTrade.  It plainly seeks to have BankTrade be as useful and as important to its clients as possible.  A loss here – thereby allowing ABN to use BankTrade in perpetuity for a fee imposed by the Court, would have the potential to destroy CSI's business.  Why would ABN be entitled to such relief and not others?  It could turn all of CSI's licenses into potential perpetual licenses (at least, so would disgruntled licensees argue) – the more reliance a licensee is on BankTrade, the lower would be CSI's leverage.  This makes no sense.  Diminishing CSI's negotiating leverage could diminish its incentives to innovate; reduced innovation could lessen CSI's

competitive position. These impacts go to the core of CSI's business. See, e.g., Buttnugget Publ'g v. Radio Lake Placid, Inc., 807 F. Supp. 2d 100, 109 (N.D.N.Y. 2011) (holding that the balance of hardships tipped "decidedly in plaintiffs' favor" because in the copyright realm, "'an injunction should be granted if denial would amount to a forced license to use the creative work of another'") (citing Silverstein, 368 F.3d at 84).

In contrast, granting an injunction simply prevents ABN from doing that which it has no right to do – using a software program it sold to BAC as part of its $21 billion deal. This bears repeating in the context of weighing hardship – whose ox is gored: ABN received $21 billion when it sold assets to BAC, including IT and its license to BankTrade. No one but ABN decided on the terms of that sale; perhaps it could have taken less and assigned the BankTrade license pre-closing. It did not. ABN's hardship is, then, self-imposed if unfortunate and decidedly inconvenient. ABN may not continue benefiting from its blatant and ongoing infringement simply because stopping that infringement will be disruptive to its business. SimplexGrinnell LP, 642 F. Supp. 2d at 197 (explaining that "loss of ability to engage in unauthorized conduct and the concomitant business opportunities that such unauthorized activities may provide" is not a legally cognizable hardship in the context of an injunction) (citing Warner Bros. Entm't, 575 F. Supp. 2d at 553); see also WPIX, Inc. v. ivi, Inc., 765 F. Supp. 2d 594, 620-21 (S.D.N.Y. 2011) (citations omitted); Capitol Records, Inc. v. Thomas-Rasset, 680 F. Supp. 2d 1045, 1060 (D. Minn. 2010) ("There is no cognizable harm to [d]efendant

36

from being enjoined from doing something that is against the law and for which she has already been found liable."); Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.") (internal quotation marks, alteration, and citation omitted).

Moreover, while BankTrade is an integral part of ABN's overall GTP trade finance platform, it is replaceable. ABN itself utilizes other competing products. That ABN has done nothing since this litigation was commenced to protect its business is a lost calculated bet. The Court notes that ABN acknowledged at the evidentiary hearing that it could itself outsource most of its trade finance functions. Finally, trade finance is a small part of ABN's overall business.

The balance of hardships tips decidedly in CSI's favor. That is not to say and acknowledge that ABN will face hardship, but it is rather to bring an end to a drawn out process that ABN could have and should have seen coming long ago.

e.  Public Interest

The public interest here clearly favors granting injunctive relief. In the absence of an injunction, this Court would be interfering with important negotiation rights, altering the parties' bargaining leverage, inserting itself as an arbitrator of a licensing fee and what are plainly complex business terms in an industry about which it knows nothing. It would, in short, be placing itself in the role of CSI's executives. These results would impact the competitive process in a manner not in

37

the public interest. The public interest favors arms-length bargaining between parties.[22]

Indeed, if this Court were to find that a license for an important piece of software may not be revoked – or, put otherwise, must be renewed – on terms the licensee considers reasonable, the Court would be flooded with requests to assume licensing responsibilities it is ill-equipped to assume. This undue burden is not in the public interest in light of its already busy dockets. To be sure, there are instances in which courts impose licensing terms – when judicial fact-finding has determined a particular and unusual need. <u>See, e.g.</u>, <u>Buffalo Broadcasting Co. v. American Soc. of Composers, Authors & Publishers</u>, 744 F.2d 917, 922-24 (2d Cir. 1984) (explaining the history of the 1941 antitrust suit brought by the United States against ASCAP and BMI, which was settled by entry of consent decrees). Courts should not wade into such deep waters casually.

---

[22] ABN argues that "money is an appropriate remedy in cases involving holdup, where the compliance with an injunction far exceeds the fair market value of a license that, in turn, impacts negotiations . . . . Here, there is real risk that holdup is disrupting the parties' ability to negotiate a license for BankTrade at the fair market value." (4/7 Tr. 46-47.) The concept of "holdsup" vis-à-vis intellectual property is a term of art and inapplicable to this situation (or it would be applicable to every situation). At oral argument, ABN cited <u>Apple, Inc. v. Motorola, Inc.</u>, 869 F. Supp. 2d 901, 917-18 (N.D. Ill. 2012), <u>aff'd in part & rev'd in part</u>, Nos. 2012 Civ. 1548, 2012 Civ. 1549, 2014 WL 1646435 (Fed. Cir. Apr. 25, 2014), in support of this assertion. In that case, the court explained: "A compulsory license with ongoing royalty is likely to be a superior remedy in a case like this because of the frequent disproportion between harm to the patentee from infringement and harm to the infringer and to the public from an injunction . . . ." <u>Id.</u> at 918. As discussed at length <u>supra</u>, the harm to CSI and the public were the Court to deny injunctive relief far outweighs the harm of an injunction to ABN; while not easy, ABN has the ability to develop a new trade finance processing system and continue on with its business. ABN's "holdup" argument is unavailing.

Moreover, this is not a situation in which ABN would effectively be put out of business as a result of the injunction. Indeed, RBS's (ABN's parent) publicly-filed documents illustrate that from 2008 through 2013, trade finance made up only 1.3% of its total income – and that figure includes <u>all</u> trade finance income, rather than just that derived at least in part from BankTrade. On the other hand, the denial of injunctive relief has the real and likely potential of destroying CSI's business.

V.     SCOPE OF INJUNCTION

The Court has considered a variety of different options regarding the proper scope of injunctive relief in this case. Namely, the Court considered (and rejected) imposing an injunction on ABN's insourcing activities but otherwise denying CSI's requested relief. To impose such a limited injunction would not sufficiently remediate the irreparable harm suffered by CSI. Indeed, while ABN may be precluded from competing with CSI for clients if it were to be enjoined from insourcing, the damage to CSI's reputation and goodwill would go unabated. Moreover, CSI would still have lost the opportunity to control its own copyrighted software – an unacceptable outcome.

Thus, the Court hereby finds that for all of the reasons discussed herein, ABN must stop using BankTrade within one year. To ensure that this transition occurs, ABN shall not use BankTrade in connection with processing any new trade finance transactions received 60 days or later from the date of this Order.

VI.   POTENTIAL FOR A STAY OF THIS INJUNCTION

The Court anticipates that ABN will move for a stay of this Order.  The Court has factored that likelihood into its determination of a reasonable transition period. For instance, if the Court grants a motion to stay this Order pending appeal, it would effectively result in additional transition time for ABN.  The Court would only grant a stay on condition that the parties both agree to move with all available speed to perfect and argue any appeals (e.g., no delays or extensions of deadlines).

VII.   CONCLUSION

For all of the aforementioned reasons, the Court hereby GRANTS CSI's motion for a permanent injunction and DENIES ABN's motion for reconsideration. ABN shall transition off of BankTrade within **one year** from the date of this Order. ABN shall not use BankTrade in connection with processing any new trade finance transactions received **60 days** or later from the date of this Order.

The Clerk of Court is directed to terminate the open motions at ECF Nos. 313 and 418.

The parties are ORDERED to appear for a conference on **June 5, 2014** at **1:00 p.m.** to discuss the issues that still remain in this litigation.

Dated: New York, New York
      May _9_, 2014

                                         KATHERINE B. FORREST
                                         United States District Judge